[S. F. No. 9071. In Bank.—May 20, 1921.]

In the Matter of the Estate of HAZEL ANDERSON, Deceased. CORA T. JENKINS, Appellant, v. HENRY ANDERSON, Respondent.

[1] UNDUE INFLUENCE—ARGUMENTS OR ENTREATIES—INSUFFICIENCY OF TO CONSTITUTE UNDUE INFLUENCE.—The mere fact that one person has been influenced by the arguments or entreaties of another is not enough to make the influence an undue one. It is not undue unless the pressure has reached a point where the mind of the person subjected to it gives way before it, so that the action of such person taken in response to the pressure does not in fact represent his conviction or desire, brought about perhaps by argument and entreaty, but represents in truth only the conviction or desire of another.

[2] ESTATES OF DECEASED PERSONS—WILLS—CHARGE OF UNDUE INFLUENCE—INSUFFICIENCY OF EVIDENCE.—In a contest of a will upon the ground of undue influence, the charge is not sustained where it appears that the testatrix was a mature and intelligent woman of sound mind; that she was married to a man of wealth very much older than herself; that she was devotedly attached to her aunt, whom she regarded as her mother; that she had a little property of her own given her by her husband, consisting almost entirely of stock in a corporation managed by her aunt's husband; that she was expecting a child and was fearful of the result of her confinement; that she wished to make provision as to the disposition of her estate and the care of her possible child in case she should die; that under the circumstances she made a will after consultation with a lawyer and when she and the aunt were away from their home together; and that the will provided for the division of her estate between the aunt and her child, if there should be one, and otherwise for it all going to the aunt, requested that the aunt be appointed guardian of the child, and stated that no provision was made for her husband as he had ample means of his own.

[3] ID.—UNDUE INFLUENCE—WHAT CONSTITUTES.—In a will contest on the ground of undue influence evidence must be produced that pressure was brought to bear directly upon the testamentary act.

2. Effect of unnatural testamentary disposition on the question of undue influence, notes, 7 Ann. Cas. 894; 6 L. R. A. (N. S.) 202; 22 L. R. A. (N. S.) 1024.

3. Undue influence which will invalidate will, notes, 16 Am. Dec. 257; 31 Am. St. Rep. 670.

But this evidence itself need not be direct; circumstantial evidence is sufficient, but it must do more than raise a suspicion; it must amount to proof, and such evidence has the force of proof only when circumstances are proven which are inconsistent with the claim that the will was the spontaneous act of the testator.

[4] ID.—ACTIVITY IN PROCURING WILL.—Activity of the beneficiary under a will in obtaining a letter of introduction to the lawyer who prepared the draft of the will and going with the testatrix to his office and there remaining in the outer room during the interview between the testatrix and the lawyer is not the activity in the procurement of the will which is necessary in order to give rise to a presumption of undue influence, as the activity must be in the use of the relation for the overcoming of the will of the testatrix.

[5] ID.—DECLARATIONS OF TESTATRIX—WHEN ADMISSIBLE.—In a will contest upon the ground of undue influence declarations of the testatrix, in order to be admissible under the exception to the rule against hearsay evidence, must, first, be indicative of the mental state of the declarant at the very time of utterance, and, second, his or her mental state at that time must be material to the issue in the case, i. e., have a reasonable evidentiary bearing upon such issue.

[6] ID.—INADMISSIBLE DECLARATIONS.—Declarations of a testatrix are inadmissible where they are indicative simply of the fact that at the time they were made, some three months after the execution of the will, the testatrix had changed her mind in regard to the disposition she wished to make of her property, and regretted the will she had made, as the fact that she had changed her mind and regretted what she had done was not material.

[7] ID.—SLIGHT BUT PREJUDICIAL EVIDENCE—EXCLUSION OF.—In such a case where the true evidentiary bearing of the evidence is at best slight and remote, and yet the evidence is of a nature such as to make it very prejudicial to the party against whom it is offered, the evidence should be excluded.

[8] ID.—DECLARATION THAT WILL MADE AT BENEFICIARY'S REQUEST—INADMISSIBILITY OF.—A declaration of a testatrix contained in a letter to one of her beneficiaries to the effect that her will had been made at the latter's request is inadmissible, on the ground

4. Sufficiency of evidence to repel presumption of undue influence from circumstances that one benefited by will was draftsman thereof, or was active in procuring its execution, note, 28 **L. R. A. (N. S.)** 288.

5. Admissibility of declarations of testator to impeach or invalidate his will, notes, 52 **Am. Dec.** 167; 5 **Ann. Cas.** 608; 10 **Ann. Cas.** 600; **Ann. Cas.** 1917D, 717.

that it was merely a declaration as to a past event and not indicative of the condition of mind of the testatrix at the time she made the will.

[9] ID.—DECLARATION OF FEAR—ADMISSIBILITY OF.—A declaration in the form of a request by a testatrix to her husband that if they return to their home he protect her against her aunt and uncle, the aunt being a beneficiary under her will, as they would be cruel to her, is admissible in a contest of her will, as it indicated her then state of mind toward her aunt, and her then state of mind toward her aunt was material, since it had a bearing on what her mental attitude toward her aunt may have been at a previous and not far distant time when she executed the will.

APPEAL from an order of the Superior Court of Sonoma County denying admission of a will to probate. George H. Cabaniss, Judge. Reversed.

The facts are stated in the opinion of the court.

R. L. Thompson and R. M. Barrett for Appellant.

J. R. Leppo, Kellogg & Kyle and Roy W. Stoddard for Respondent.

OLNEY, J.—This is an appeal from an order refusing the admission to probate of a certain holographic instrument purporting to be the will of Hazel Anderson, deceased. The order was made after formal contest and jury trial. The authenticity of the instrument was not questioned, and the grounds of contest assigned were that it had been executed under the undue influence of the proponent, who was the sole beneficiary and is the appellant here, that it had been executed when the testatrix was of unsound mind, and that it had been revoked. At the trial a nonsuit was granted as to the two latter grounds, and the cause submitted to the jury upon the single issue as to undue influence. Upon this issue the jury found against the instrument, and upon their verdict the order appealed from was made. Of the grounds urged for reversal but two require consideration. They are (1) that the verdict is not supported by the evidence, and (2) errors in the admission of evidence. The first of these grounds necessitates a review of the evidence.

The proponent of the will is an aunt of the decedent, and the contestant is the decedent's husband. The decedent had been left an orphan when very young and had been brought up in the family of her aunt. The very closest relations existed between them, fully as close as those usually existing between a mother and an affectionate and tractable daughter, and they regarded each other as if that were in fact their relation. The deceased was a woman of education, intelligence, and individuality, and there is not present in the case any element of the control or domination of a weak or subnormal mind by a stronger or more vigorous personality. There was some testimony as to occasions when the deceased and her aunt had differed about minor matters, some of them purely personal to the deceased, such as matters of dress, and the deceased had given way to her aunt. But there was nothing more shown than the deference which, as between mother and daughter, the younger woman might very reasonably and properly show to the opinions of the older. The case is but one of a close and intimate relation, as of mother and grown daughter, with no more of subserviency on the part of one to the other than may naturally and properly exist in such a relation.

At the time of the decedent's marriage the parties were living in Reno, Nevada. The aunt's husband was managing a general store there, assisted by his wife, and the niece was employed in the store. There she met the contestant, who was one of the principal stockholders of the corporation owning the store, and married him. He was very much older than she, he being sixty-seven at the time and she twenty-seven. He had been married previously, and had a family of grown children. He was also a man of wealth, while she had nothing.

Something over a year after the marriage, the deceased became pregnant, and in February, 1918, she and her aunt came to San Francisco to make purchases in preparation for the expected child and to attend to some other matters. It had been planned that the husband should accompany them, but his wife informed him that her aunt preferred that they should go alone, and he permitted them to do so. While the two women were thus alone in San Francisco, the instrument in question was executed. The decedent's mother had died in childbirth and the decedent greatly feared the

same fate for herself, and the will was undoubtedly made by her because of her approaching confinement and the danger incident to it. Her only estate at the time consisted in some personal belongings and shares of stock of the value of about six thousand dollars in the corporation owning the store at Reno managed by her aunt's husband, all of which the decedent's husband had given her from time to time after their marriage.

The will made by the decedent under the foregoing circumstances gave one-half of her estate to her aunt, and the other half to any child or children that might survive her. If no child survived her, the whole estate was to go to her aunt. The will also named the aunt as executrix, and expressed the wish that she be appointed the guardian of the estate of any child who might survive the decedent. The will also stated that the decedent made no provision for her husband for the reason that he had ample means of his own and needed no provision from her separate estate.

There is no evidence of the aunt importuning the decedent or otherwise exercising any pressure upon her either to make a will or to make one in her aunt's favor. All that appears is that the decedent, before coming to San Francisco, had expressed a wish to make a will and had told her aunt that she wished her to have what she had when she died. The sole witness as to the immediate circumstances under which the will was executed was the aunt, who was called for the purpose of testifying upon the point by the contestant himself. He is, of course, not bound by her testimony (Code Civ. Proc., sec. 2049), and the jury was at liberty to reject any of it that did not seem to them worthy of belief, but rejecting it, there is no evidence to take its place and, as was said of a similar case in *Estate of Kilborn,* 162 Cal. 4, [120 Pac. 762], the case is without evidence upon the point. The circumstances as testified to by the aunt were that shortly after the arrival of the two women in San Francisco, at the suggestion of the niece, the aunt made inquiry of a woman, with whom they had business, as to a competent lawyer. The woman recommended a Mr. Clark, a reputable attorney, and gave the aunt a letter of introduction to him. The aunt and the niece presented this letter together, the aunt asked him about some matters of her own, and then retired from the room while the

niece consulted him about her will. The aunt remained without the room during the interview between the lawyer and the niece, except that at one time she was called in by the niece, who wished to inquire about a date. When the ladies left, the lawyer was to prepare a draft of a will which would express the wishes of the niece as told to him by her. This he did, and the ladies later returned and the niece obtained the draft. From this draft she prepared the will in question here, writing it in her room one afternoon when the aunt was out, and putting it in her aunt's suitcase in a sealed envelope. On her aunt's return she told her what she had done and asked her to put the will in the safe of the store at Reno. The aunt kept the will until her return to Reno, and then placed it in the safe as requested.

There was also considerable evidence as to events occurring subsequent to the execution of the will, but for the most part this evidence is wholly immaterial upon the issue of undue influence, and yet is of a character to influence the jury strongly against the will, since it indicates that the decedent immediately before her death had changed her intention as to the disposition of her property and desired to revoke the will, a desire which her untimely death alone prevented her from carrying into effect. It seems that at the end of their stay in San Francisco the two ladies went to Sacramento, where they were met by the decedent's husband. From there the aunt returned to Reno, and the niece and her husband went to Santa Rosa pursuant to a plan they had to settle in California, if they found a place agreeable to them. They found Santa Rosa agreeable, and the husband purchased a home and a farm there at an aggregate cost of about eighteen thousand dollars. These he had conveyed to his wife, so that at her death her estate consisted of this property as well as of the six thousand dollars in stock and the personal belongings which she had at the time she made the will. The husband and wife remained at Santa Rosa, the aunt visiting the niece but once and then for but a few days, and at the suggestion of the husband in order that someone might be with his wife while he was away on business. Some three months after the making of the will, the expected child was born, but born dead. The mother was able to be about within a few days, but blood

poisoning then came on and she died on the eighth or the ninth day after the birth.

A nurse who was in attendance testified over the objection of the proponent of the will that some days after the birth she found the decedent by the side of her bed praying and repeating over and over, "Dear God, just now forgive my sin, and help me to make it right with Mr. Anderson."

The contestant, over the objection of the proponent, was permitted to testify to a number of conversations with his wife occurring after her confinement. According to his testimony, she several times requested him to get an attorney who might draw some papers undoing an unjust act that she had done toward him and which her aunt and uncle were the cause of her doing. He put her off, saying that they could go to Reno and fix the matter directly with the aunt and uncle. In reply to this suggestion she asked that in case they went to Reno he protect her, as her aunt and uncle would be very cruel to her. Two days before her death she prepared a preliminary draft of a letter to her aunt and also a letter. The letter was mailed by her husband at her insistence, but was not received until after her death, and on its receipt was destroyed by her uncle. The preliminary draft read:

"June 13—1918, Santa Rosa, Cal.
"Dear Auntie:

"Will you kindly forward the original will which you witnessed in San Francisco when we were down there. I have not been able to sleep at night and feel when I get these papers here and get that ignoble act undone.

"Hope you and children are well.

"HAZEL LENORE ANDERSON."

The letter itself, according to the contestant's testimony, read:

"Santa Rosa, California, June 13, 1918.
"Dear Auntie: Will you kindly forward those papers, which at your request was drawn up in San Francisco. I wish to revoke that ignoble act done, and forward same to me immediately. I have not been able to sleep since you left me.

"HAZEL LENORE ANDERSON."

Although the decedent had expressed her wish to her husband to undo an "ignoble" act which she had done toward

him, and although the husband read both the foregoing preliminary draft and the letter itself before the letter was mailed, and the matter was the subject of more than one conversation between them, the fact, according to his testimony, is that he did not know that his wife had reference to a will she had made, and did not know until after her death that she had made a will.

The foregoing being the facts and circumstances of the case as shown by the evidence, the question presented by the appellant's first contention is, Are they sufficient to prove affirmatively, as a conclusion fairly to be drawn from them, that it was actually the fact that in executing the will the mind and will of the testatrix were overpowered by her aunt? Viewing the question purely as one of fact to be determined from the facts and circumstances shown in evidence, it would seem plain enough that the evidence is sufficient to raise only a suspicion, if even that, that the mind of the testatrix may have been overpowered, and is not sufficient to justify, as the basis for judicial determination and action, the definite conclusion that it was in fact overpowered. It is no easy thing to overpower the mind of a normal person in full possession of his senses by the mere pressure of importunities and entreaties, and there is certainly not even a suspicion in the present case that any more drastic or compelling form of pressure was used.   [1] The mere fact that one person has been influenced by the arguments or entreaties of another is not enough to make the influence an undue one. It is not undue unless the pressure has reached a point where the mind of the person subjected to it gives way before it so that the action of such person taken in response to the pressure does not in fact represent his conviction or desire, brought about perhaps by argument and entreaty, but represents in truth but the conviction or desire of another. As was said in *Estate of Donovan*, 140 Cal. 390, 394 [73 Pac. 1081], quoting from Chaplin: "The true test of undue influence is that it overcomes the will without convincing the judgment." This can happen but rarely in cases of persons of normal strength of mind in the full possession of their faculties unimpaired by infirmity. The evidence which would justify the conclusion that it had occurred in any particular case of that character would have to be very strong indeed. This, of

course, is not true where the mind of the person subjected
to the pressure is naturally weak or is impaired by sick-
ness, extreme physical weakness, or some other cause, and
it will be found upon examination that in nearly every
case where a will has been set aside as the result of undue
influence consisting simply in the pressure of importunity
and entreaty, there has existed the element of a mind and
will weak or for some reason impaired.   That element is
not present here, and it is simply incredible, upon the facts
presented in the case before us, that the mind of the tes-
tatrix, a woman of mature years and of at least normal
strength of mind, intelligent, in the full possession of her
faculties, and in good health, was overcome by the pressure
of importunities and entreaties on the part of her aunt.
There is in fact no evidence that such pressure was exerted.
The outstanding features of the case are simply: **[2]** That
the testatrix was a mature and intelligent woman of sound
mind; that she was married to a man of wealth very much
older than herself; that she was devotedly attached to her
aunt, whom she regarded as her mother; that she had a
little property of her own given her by her husband con-
sisting almost entirely of stock in the corporation managed
by her aunt's husband; that she was expecting a child and
was fearful of the result of her confinement; that she
wished to make provision as to the disposition of her estate
and the care of her possible child in case she should die;
that under the circumstances she made a will after consulta-
tion with a lawyer, and when she and the aunt were away
from their home together; and that the will provided for
the division of her estate between the aunt and her child,
if there should be one, and otherwise for its all going to
the aunt, requested that the aunt be appointed guardian of
the child, and stated that no provision was made for her
husband as he had ample means of his own.

It is doubtful if these circumstances would justly raise
even a suspicion.   Much less do they come up to the test
prescribed in *In re McDevitt*, 95 Cal. 17, [30 Pac. 101],
a test which has been reiterated and reapplied in numerous
subsequent decisions by this court.   It was there said (page
33): **[3]** "Evidence must be produced that pressure was
brought to bear directly upon the testamentary act; but this
evidence itself need not be direct.   Circumstantial evidence

is sufficient. It must, however, do more than raise a suspicion. It must amount to proof, and such evidence has the force of proof only when circumstances are proven which are inconsistent with the claim that the will was the spontaneous act of the alleged testator. I think there is nothing beyond suspicion shown here."

Applying this test, what circumstance is there in this case which is "inconsistent with the claim that the will was the spontaneous act of the alleged testatrix?" The only one upon which stress is laid is the provisions of the will itself, and in particular that it should give the estate to the decedent's aunt instead of to her husband, from whom she had received it all. But when we consider the small amount of the estate she was disposing of, consisting as it did when she made the will only of personal belongings and stock in the store corporation to the amount of six thousand dollars, and the fact that her husband, as she says, had ample means, it was not unnatural that she should wish her little to go to her aunt and foster-mother. This situation was considerably changed by the subsequent very substantial gifts to her of the home and farm at Santa Rosa, and it may well be that it was due in some part to this that she subsequently desired to revoke the will. But the validity of the will must be determined by the situation as it existed at the very time it was executed, and the situation then was that she was disposing of a comparatively small amount. Stress is also laid on the provision of the will requesting that the aunt be made guardian of her child. This also is a not unnatural provision when we consider the ages and sexes of the parties. The husband was sixty-nine and a man, and the aunt was forty-seven and a woman. It was not unnatural that the testatrix should expect and hope that it would be the latter who would have the bringing up of her infant child in case she herself should pass away. The only feature of the will whose naturalness can be at all justly questioned is not that it gives the testatrix's estate to her aunt instead of to her husband, but that it gives one-half to her aunt if a child survives, instead of giving it all to the child. But here again when we consider the small amount that would be left to the aunt in such a case, some three thousand dollars, and the burden that would be assumed by the aunt, if the raising of the child were

entrusted to her, any unnaturalness of the will in this respect largely, if not entirely, disappears.

The circumstances of this case are not dissimilar from those in numerous other cases which have from time to time been presented to this court, and so far as we are aware it has been held without exception that such circumstances are insufficient to justify a finding of undue influence. In the very case from which we have just quoted of *In re McDevitt*, the facts were that the testator was an old man, an invalid suffering from cancer from which he finally died, a bachelor living with a brother, that his will was executed at the house of this brother and left everything to him and to his children to the exclusion of the children of two deceased brothers living in the same city and with whom the testator was on friendly terms. There was also evidence that the brother, who was the beneficiary, had abused the testator and that the latter was very much afraid of him. The only particular in which the facts in the case differ from those before us in a respect favorable to the contestant here is that the brother was not present, even outside the room, when the testator was consulting his lawyer and the will was executed. The jury found that the will was executed under the undue influence of the brother, and on appeal the verdict was set aside as not supported by the evidence. Among other things pertinent to the present discussion contained in the opinion is the following: "General influence, not brought to bear upon the testamentary act, however strong or controlling, is not undue influence. There must be proof that the influence was used directly to procure the will, except in those cases where the beneficiaries or parties instrumental in having the will executed sustained a confidential relation to the testator. This case is not within the exception."

In *In re Langford*, 108 Cal. 608, [41 Pac. 701], the testator left the bulk of his estate to a second wife to the practical exclusion of his children by a former marriage. The jury found that the will was executed under the undue influence of the wife and on appeal the verdict was set aside as not supported by the evidence. There was evidence that the testator habitually deferred to the wishes of his wife; that he appeared to be afraid of her, and that he declared on several occasions that his children should have his prop-

erty when he died. The court said of the case, as might be said of the present one: ''This is not the case where a man makes a will upon his death-bed, surrounded by those who turn out to be his devisees; nor is it a case where a weak person at the time of the execution of his will is teased and tormented by the importunities of relatives who do not allow him to be out of their sight, or to have any opportunity for quiet thought or independent advice.'' The single particular in which the facts were less favorable to the contestant than those appearing here is that the will was executed at the office of the testator's lawyer, where he had gone alone. This, of course, is an important feature, but its importance is much reduced in the present case by the fact that for the whole period of three months between the execution of the will and the confinement of the testatrix she was, except for a few days, with her husband and away from her aunt, and was not even intending to return to live near her aunt. Any element of undue influence must have been removed; she had ample time to change the disposition she had made, and yet there is no suggestion that such change was desired by her until after her confinement. As was said in the Langford case, ''she had ample opportunity to fully and freely think out what she wanted to do, and to change any conclusion she might have arrived at, if she so desired.''

In *Estate of Calef,* 139 Cal. 673, [73 Pac. 539], the testatrix had made a will giving a substantial legacy to the contestant and making only a small contingent provision for one Mabel Tickell. Thereafter she made a codicil giving Mrs. Tickell a substantial amount and correspondingly reducing the legacy to the contestant. Both will and codicil were offered for probate, and the contestant contested the validity of the codicil on the grounds that it had been executed under the undue influence of Mrs. Tickell, and that the testatrix was of unsound mind at the time. The jury found against the codicil on both grounds. It appeared that the testatrix was a widow without children. Her husband, however, had had three children by a former marriage, one of whom was the mother of Mrs. Tickell. The testatrix always had great affection for this stepdaughter and her daughter, and called them her daughter and granddaughter and treated them as such. About two years after

making the will she suffered an attack of paralysis from which she finally died. Immediately after suffering this attack she went to live at the home of her stepdaughter, the mother of Mrs. Tickell, and remained there until her death. Shortly before going there she had told her lawyer to prepare a draft of the codicil in question and send it to her at her stepdaughter's home. This the lawyer did, and upon receipt of the draft the testatrix made a copy of it in her own hand as a holographic instrument. At the time she did this Mrs. Tickell was with her, and the eyesight of the testatrix being bad, read the draft to her. There was also evidence of unsoundness of mind, although how substantial the evidence was does not appear. About a year after the making of this codicil the testatrix died. It must be evident that in nearly every particular the circumstances of this case were more favorable to the contestant than those of the present case, but, nevertheless, the court held that they were insufficient to justify the verdict of undue influence.

In *Estate of Higgins,* 156 Cal. 257, [104 Pac. 6], the testator had made a will substantially preferring one son to his other children. The evidence for the contestants showed that the will was executed on the day preceding the testator's death, that he was a man of advanced years, in poor health, and greatly weakened mentally, and that the testator reposed great confidence in the son who was preferred and the latter had from time to time importuned his father to settle his affairs. The will was executed by the testator at his home after consultation with a lawyer. The son accompanied the lawyer to the house when he went there for the purpose of having the will executed, but was not in the room either at the preliminary consultation or at the time of execution. It was held that the evidence did not justify a finding that the will had been executed under the undue influence of the son.

In *Estate of Lavinburg,* 161 Cal. 536, [119 Pac. 915], the testator, a man of advanced years, had made a will leaving the bulk of his estate to two daughters to the exclusion of a son to whom he was much attached and of two other daughters. The will was attacked as made under the undue influence of one of the daughters benefited, and the jury found against the will. It appeared that the tes-

tator had made a second and very unhappy marriage; that the will was made when he was in serious trouble with his wife and greatly perturbed because of it; that he placed the utmost confidence in the daughter who was claimed to have unduly influenced him; that immediately prior to the making of the will he had transferred to her a large part, if not practically all, of his estate, to hold as trustee for him; that she suggested at the time of this transfer that he should make a will and he immediately consulted a lawyer for that purpose and did so, and that the daughter exerted great influence over her father and boasted of it. It was held that the evidence was no more than sufficient to raise a suspicion, and did not amount to proof of undue influence, and the verdict of the jury was set aside. It is to be noted that in the particular that the daughter not only occupied a relation of affection and great confidence toward her father, but was as well an actual trustee for him for a considerable portion of his estate, the facts were stronger in favor of the contestant than in the present case. On the other hand, it should be said that the will was executed wholly without the presence of the daughter, and importance is attached in the opinion of the court to that fact. It did appear, however, that the daughter had gone with him to the trust company, whose attorney prepared the will on the occasion when he consulted that attorney in regard to making a will.

In *Estate of Morcel*, 162 Cal. 188, [121 Pac. 733], the testatrix left her entire estate to her husband to the exclusion of her daughter by another man. The jury found that the will had been executed under the undue influence of the husband, who not only lived with the testatrix on terms of affection and confidence, but who had been entrusted by her with her business affairs, she being ignorant and illiterate. Of the details of the case in general, it is necessary to say only that they were no less favorable to the contestant than the circumstances of the present case. There is one particular, however, that is worthy of note, and that is the important particular of the circumstances immediately surrounding the execution of the will. It is worthy of note because those circumstances closely resemble those surrounding the execution of the present will, and to the extent to which they differ are more favorable to the con-

testant. The circumstances were that the testatrix's husband not only went with her when she went to the office of their lawyer for the purpose of making a will, but, unlike the aunt in this case, he actually remained in the room with her when she gave instructions as to the provisions she desired, and executed the will drawn in accord with those instructions. The court, nevertheless, set aside the verdict of undue influence as not justified by the evidence.

In this immediate connection, the decision in *Estate of Purcell*, 164 Cal. 300, [128 Pac. 932], should be noted. There a widow of advanced years, ill and about to undergo a severe operation, made a will in favor of her husband's brother and sister and her housekeeper to the exclusion of her heirs. The estate was large and the will was contested on the grounds of unsoundness of mind and of undue influence on the part of the three beneficiaries, particularly on the part of the brother-in-law. The contestants were nonsuited, and on appeal the order of nonsuit was upheld. The physician of the testatrix testified that her mind was somewhat impaired by age and there was also the evidence of acquaintances that in their opinion she was of unsound mind. It also appeared that the brother-in-law had been her business adviser and manager ever since the death of her husband, so that a fiduciary relation was involved as well. The circumstances surrounding the execution of the will closely resemble those now before us. A lawyer was summoned to the house of the testatrix by the brother-in-law, and going there was taken to the room of the testatrix where there was also present one of the other beneficiaries. The lawyer and the testatrix were, however, left alone while she gave him instructions about the will she desired. The next morning she went to the lawyer's office to execute the will, accompanied by the brother-in-law, who, however, was not present in the inner office when the will was executed. If a nonsuit were proper in the case of a will executed under these circumstances in favor of a fiduciary agent by an ill woman of advanced years whose mind was somewhat impaired by age, certainly a nonsuit would have been proper in the present case.

In *Estate of Gleason*, 164 Cal. 756, [130 Pac. 872], the will involved was one whereby the testator left his entire

estate to his wife to the exclusion of his sister.  It appeared
that the testator at the time of his marriage was a man of
sixty, while his wife was only twenty-two, and even at that
youthful age had had such a varied matrimonial career that
the testator was her third husband; that he had been mar-
ried before and had been devotedly attached to his first wife,
with whom he had lived happily for thirty years, and had
married the second wife within a year after her death and
upon a short acquaintance; that he had numerous sick spells
for relief from which he was accustomed to take morphine;
that the second wife secured the will within a few hours
after its execution, inquired of one of the witnesses to
it if he had in fact witnessed it, and then placed it in her
safe deposit box, and that within seven weeks after the
execution of the will the testator died.  It also appeared
that while the will had been executed without the presence
of the wife and at the office of a notary public, where the
testator had gone for the purpose, the testator returned
to the office of the notary within a few minutes in a state
approaching nervous collapse, and, referring to the will and
to the fact that he had required the notary to acknowledge
its execution as well as to witness it, said, "But I had to
do it.  I had to do it right or hell would pop at home; I
could not stay there."  Certainly these circumstances and
such evidence go much further to justify a suspicion at least
of undue influence than those of the present case, but it
was held that they were insufficient to have justified a find-
ing of undue influence by the second wife.

It would serve no useful purpose to discuss the compara-
tively few decisions of this court in which an order setting
aside a will for undue influence has been upheld.  Suffice
it to say that in practically all of them there entered either
the element of a weak, unsound, or impaired mind, includ-
ing a mind impaired by great physical weakness, or the
element of a will procured by one who occupied a fiduciary
relation to the decedent, who was not a natural object of the
decedent's testamentary bounty, and who yet benefited sub-
stantially by the will.  Examples of the first class of cases
are *Estate of Snowball,* 157 Cal. 301, [107 Pac. 598], *Es-
tate of De Laveaga,* 165 Cal. 607, [133 Pac. 307], and *Estate
of Jones,* 166 Cal. 108, [135 Pac. 288].  An example of
the second class is *Ross* v. *Conway,* 92 Cal. 632, [28 Pac.

785]. Not infrequently both elements are present, as was true in *Estate of Nutt,* 181 Cal. 522, [185 Pac. 393]. Not infrequently there enters also the element of some fraud or deceit practiced by one occupying a confidential relation. None of these elements is present in the case at bar.

The contestant contends that because of the intimate and affectionate relation which existed between the decedent and her aunt, there arises a presumption of undue influence. This feature was present in most, if not all, of the cases which we have just reviewed at length, and it is apparent that if there be such a presumption here and it is controlling, it was likewise present in those cases and should have been there held to be controlling, and a different result reached. In many of them, furthermore, the same contention as to a presumption was made and was discussed and overruled. (See, for example, *Estate of Langford,* 108 Cal. 608, 622, [41 Pac. 701].) It has also been presented in a number of cases we have not referred to. *Estate of Ricks,* 160 Cal. 450, [117 Pac. 532, 536], is an example. There, a mother made a will giving her property to two sons to the exclusion of a third. The relation between one of the sons who was a beneficiary and his widowed mother was not only the close relation which naturally exists between mother and son, but the son had also had charge for years of all her business affairs. There was no evidence whatever as to the circumstances under which the will was executed and the contestant, the disinherited son, contended that because of the relations between his mother and his brother a presumption of undue influence arose which the latter had to overcome. The jury found against the will, and on appeal the verdict was set aside, the court saying (page 461) in regard to the claim that a presumption of undue influence existed: "But no warrant is given to a jury to find that undue influence was exerted at the time the will was made from proof merely of such relation alone. Undoubtedly the relation between respondent and his mother was affectionate and confidential and that (*sic*) he would have a general influence over his mother proceeding from such relation. But the existence of such relation and this general influence raises no presumption that undue advantage was taken of it by respondent. There is no legal suspicion of undue influence arising from the existence of such a

relationship, which imposes upon the son the necessity, when a will in his favor is attacked, of assuming the burden of proof that he had not unduly influenced his mother in making the will. The confidential relation and the opportunity afforded therefrom to exercise undue influence, may, of course, always be taken into consideration with other evidence, when the question of undue influence is in issue. But the relation itself, and opportunity, are not sufficient alone to warrant a finding that undue influence was actually exerted. Proof, merely, that confidential relations existed between a testator and the main beneficiary under his will is not sufficient to destroy its validity, but there must be some proof, in addition to the relation, of facts or circumstances showing the use of that relation at the time the will was made overcoming the free will and desire of the testator, in order to invalidate the testament.'' (See, also, *Estate of Baird,* 176 Cal. 381, [168 Pac. 561].)

[4] It is also claimed, however, that there was present in the case at bar the element of activity on the part of the aunt in the procurement of the will. The only evidence of such activity is that she obtained a letter of introduction to the lawyer who prepared the draft of the will and went with the testatrix to his office and there remained in an outer room during the interview between the testatrix and the lawyer. But this is not the activity in the procurement of the will which is necessary in order to give rise to a presumption of undue influence. The activity must be in the use of the relation for the overcoming of the will of the testator. As was said in *Estate of Ricks* (to quote again), ''there must be some proof, in addition to the relation, of facts or circumstances showing the use of that relation at the time the will was made overcoming the free will and desire of the testator, in order to invalidate the testament.''

It is also worthy of note in this connection that in *Estate of Morcel,* 162 Cal. 188, [121 Pac. 733], heretofore referred to, where the husband was accused of procuring the will of his wife by undue influence, the same activity as that shown here appeared, that is, the husband went with the wife to the lawyer's office when the will was drawn and executed (in fact he remained in the room during the whole time), the same contention as to a presumption arising

was made as is made here, and the contention is directly overruled. Other cases of well-nigh identical facts where the same contention was made are *Estate of Latour,* 140 Cal. 414, 423, [73 Pac. 1070, 74 Pac. 441], *Estate of Calef,* 139 Cal. 673, [73 Pac. 539], and *Estate of Purcell,* 164 Cal. 300, 128 Pac. 932].

Our conclusion then is that the evidence is insufficient to sustain the verdict of undue influence.

[5] As to the declarations of the decedent admitted over the objection of the proponent, the contention that their admission was error must also be sustained as to some. Such declarations were hearsay, pure and simple. The only exception to the rule against hearsay within which they could come is the exception which admits declarations indicative of the declarant's intention, feeling, or other mental state, including his bodily feelings. But such declarations are competent only when they are indicative of the declarant's mental state at the very time of their utterance, and only for the purpose of showing that mental state. It follows from this that unless his mental state at that time is material to the issue under investigation, the declarations are not admissible, even though they do show his mental state at that time, not because they are not competent for that purpose, but because that purpose is not germane to the issue. These general propositions are settled by a multitude of authorities, including some where the issue was one as to undue influence in the making of a will. (See *In re Calkins,* 112 Cal. 296, [44 Pac. 577]; *In re Kaufman,* 117 Cal. 288, [59 Am. St. Rep. 179, 49 Pac. 192]; *Estate of Snowball,* 157 Cal. 301, [107 Pac. 598]; *Estate of Ricks,* 160 Cal. 450, [117 Pac. 532]; *Estate of Gleason,* 164 Cal. 756, [130 Pac. 872]; *Estate of Jones,* 166 Cal. 108, [135 Pac. 288].) Now, the declarations of the testatrix admitted in the present case were admitted on the theory that they were competent only to show her state of mind when uttered, and the jury were so charged. But although admitted for this purpose alone, most of the declarations do not come within the exception to the hearsay rule. As may be seen from the foregoing statement of the exception, in order that a declaration be within it two things are requisite: (a) the declaration must be indicative of the mental state of the declarant at the very time of utterance, and (b)

his or her mental state at that time must be material to an issue in the cause, i. e., have a reasonable evidentiary bearing upon such issue.

[6] The declarations in the present case are of three sorts. First, there are the declarations indicative simply of the fact that at the time they were made, some three months after the execution of the will, the testatrix had changed her mind in regard to the disposition she wished to make of her property, and regretted the will she had made. If that change of mind and regret had been material, evidence of the declarations would have been competent. The point is that the fact that she had changed her mind and regretted what she had done was not material. It made no difference whether she had or not. The only evidentiary bearing of the fact on the issue before the jury, that of undue influence at the time of the execution of the will, lay in the possibility of reasoning from the fact that the testatrix had changed her mind and regretted what she had done that she had possibly acted only under undue pressure in the first instance. But this bearing is exceedingly slight and remote, or, in other words, the probative value of the fact that she had changed her mind as showing that she had not acted freely in the first instance, is almost, if not quite, *nil*. On the other hand, the fact that the testatrix had changed her mind was one which, if put before the jury, would almost certainly affect them greatly, and would in and of itself be given great weight by them, regardless of what its bearing on the real issue before them might or might not be. [7] Under such circumstances, where the true evidentiary bearing of the evidence is at best slight and remote, and yet the evidence is of a nature such as to make it very prejudicial to the party against whom it is offered, the evidence should be excluded. (See *Adkins* v. *Brett,* 184 Cal. 252, [193 Pac. 251].)

[8] The second sort of declaration is the one contained in the letter by the testatrix to her aunt to the effect that the will had been made at the latter's request. This was not properly admissible for a reason just the converse of that applicable to declarations of the first sort. The fact declared, that the will was made at the request of the aunt, did have a very direct bearing on the issue in the case and was quite material. But the declaration of this fact was

not admissible because it was merely a declaration as to a past event and was not indicative of the condition of mind of the testatrix at the time she made it. It was, therefore, not within the exception to the hearsay rule. (*Estate of Jones,* 166 Cal. 108, 117, [135 Pac. 288].)

[9] The third sort of declaration is the request by the testatrix of her husband that if they returned to Reno he protect her against her aunt and uncle, as they would be cruel toward her. This is the only declaration which meets both the requirements necessary in order to bring a declaration within the exception. It (a) indicated her then state of mind toward her aunt, and (b) her then state of mind as so indicated was material, since the fact that she then feared her aunt had a reasonably direct bearing on what her mental attitude toward her aunt may have been at a previous and not far distant time, when she executed the will.

Order reversed.

Lennon, J., Shaw, J., Lawlor, J., and Angellotti, C. J., concurred.

Rehearing denied.

All the Justices concurred.