[Civ. No. 10221. First Appellate District, Division One.—August 21, 1936.]

In the Matter of the Estate of LILLIE J. MILLER, Deceased. JAMES C. MacFARLANE et al., Respondents, v. WILLIAM FARWELL, as Executor, etc., Appellant.

D. T. Jenkins, Owen D. Richardson and Donald B. Richardson for Appellant.

Charles A. Thompson and Robley E. Morgan for Respondents.

BRAY, J., *pro tem.*—The will of Lillie J. Miller, deceased, was admitted to probate. Thereafter James C. MacFarlane, William M. MacFarlane and Mary Manson, respondents herein, filed their petitions to revoke the probate of said will upon the grounds: First, that the said Lillie J. Miller was not of sound mind at the time of the execution of

said will, and secondly, that it was obtained by the undue influence of William Farwell and Miss Blanche Carpenter. After answer filed the respondents demanded a trial by jury. The trial commenced before a jury and on the second day of the trial appellant made a motion for a mistrial upon the ground that one of the women jurors was intoxicated. Testimony was taken on this question and the court denied the motion. The respondents offered to waive a jury trial. A clerk in the probate department was called by the court of its own motion and testified that the respondents had not paid the jury fees for that particular day. The counsel for appellant offered to pay the jury fees, but the court rejected the offer. Thereupon the court dismissed the jury for the nonpayment of such fees. Appellant then demanded that the case be tried by a jury. This the court denied, and directed that the trial proceed. The trial proceeded, and at the termination thereof the court found that the deceased was of unsound mind at the time of executing her will and that the will was procured through the undue influence of the two persons above mentioned, and ordered the will revoked. From this order appellant herein appeals.

Appellant contends, first, that the court erred in discharging the jury, and secondly, that the evidence is insufficient to justify the findings of undue influence and mental unsoundness.

At no time prior to the second day of the trial did appellant demand a jury. Therefore he waived it. (Sec. 631, Code Civ. Proc.) The words of the court in *Dunham v. Reichlin*, 217 Cal. 289 [18 Pac. (2d) 664], are applicable here: ''The defendant contends, however, that where, as here, one party to the litigation has demanded a jury, it becomes unnecessary for the other party to do so, and that he may rely upon the demand of his adversary. But the provisions of the code above quoted are unqualified, unambiguous and certain. (*Stern v. Hillman*, 115 Cal. App. 156 [300 Pac. 972].) It is reasonable to assume that if an exception to the requirements laid down by the code were to be effective, the legislature would have inserted it.''

The failure of a party demanding the jury to pay the fees did not give the other party who had not demanded a jury the right to proceed with a jury, even though the latter party offered to pay the fees. Appellant having once

waived a jury trial under the statute, could not be restored to the right which he had waived, either by the actions of the respondents in failing to perform the act which they were required to perform to entitle them to a jury trial, namely, the deposit of fees each day (subd. 7, sec. 631, Code Civ. Proc.), or by the waiver of a jury by the respondents.

The provisions of section 615 of the Code of Civil Procedure are not applicable here as the court denied the application of the appellant for a mistrial, thereby holding, in effect, that the juror was not ill or intoxicated. However, this question is of no importance, as the court properly dismissed the jury for waiver thereof by both parties, first by the appellant and secondly by the respondents, the only party demanding the jury. Such waiver by the latter was made in two ways—one, a waiver in open court; two, a waiver by failing to pay the jury fees.

Nor is the act of 1917 (Stats. 1917, p. 788; Deering's Gen. Laws, 1931, p. 1168, title 192) involved in this matter. Appellant apparently takes the position that under the provisions of that act, when a party who has demanded a jury trial fails to pay the jury fees, the trial must stop until such fees are paid, and then if paid, go on again with a jury. Section 28 of the act of 1917 merely provides at most that where a jury is discharged without a verdict, all jury fees must be paid by the party demanding the jury before any further proceedings shall be had. There is nothing in the record to show that the respondents did not pay all the jury fees due, and moreover, no objection upon this ground was made in the lower court to the trial proceeding. The appellant's objection was to the case being tried by the court instead of a jury, and not because the court was proceeding while some jury fees were unpaid. Moreover, this act only applies after a jury is *discharged,* and appellant is trying to make it work a restoration of a *discharged* jury, which, of course, cannot be done.

Appellant contends that the evidence is insufficient to justify the findings of undue influence and mental unsoundness. In will contests the rule is the same as in other proceedings, that all questions of the weight of the evidence and the credibility of the witnesses are for the trial court, and if there be any substantial evidence to support the finding it cannot be set aside by the reviewing court, even

though said court might believe the great preponderance of the evidence was the other way. (*Estate of Ramey*, 62 Cal. App. 413 [217 Pac. 135].) The question here, then, is as to whether or not there is any substantial evidence to support the findings of undue influence and mental unsoundness. There was abundant evidence to establish the following facts:

At the time the will in question was signed the testatrix was seventy-two years of age, and was confined in the hospital, having been there since June 25, 1934. The will was executed September 19, 1934, at 1:30 P. M., and the testatrix died September 21st at 10:20 A. M. She was a spinster school teacher, and her heirs at law were the respondents, who are her brothers and sister, respectively, and who reside in the east. Until about four years prior to her death, testatrix was a member of a religious organization founded and conducted by the appellant, William Farwell, in the city of San Jose. The organization was originally known as the "Home of Truth", but is now known as the "Christian Assembly". It practiced and taught faith healing. Miss Blanche Carpenter was a teacher and healer and copastor in the organization with the appellant Farwell. Testatrix, about four years before her death, ceased attending the meetings of the Christian Assembly. Testatrix became afflicted with cancer about eighteen months before her death. Although the disease progressed, she refused medication or healing treatments of any sort. On June 25, 1934, this disease caused the right femur of her leg to fracture of its own weight, and she was then taken to the San Jose hospital and placed under the care of Dr. J. I. Beattie. Although her right breast was practically destroyed and the right femur almost entirely gone as a result of the disease, and while she had extensive cancer involvements to the pelvic bones and the spine, for some time after admission to the hospital she was opposed to medication although suffering much pain. She was emaciated from lack of nourishment. For several days before her death she was kept continually under the influence of opiates. About three weeks before her death she was called upon by the hospital credit manager in regard to her account at the hospital, which excited her very much, and Dr. Beattie suggested to her that she arrange her affairs so as not to be further annoyed.

Testatrix stated that if she did anything of that kind she wanted Mr. Maurice Rankin, an attorney of San Jose, to take care of her affairs, and would let the doctor know later. While ill in the hospital testatrix had turned over to one Clara J. Morrison, a neighbor, certain building and loan books with the keys to her safe deposit box so that Mrs. Morrison could pay decedent's bills. Testatrix was possessed of real and personal property of the value of about $25,000. On September 17th testatrix was apparently unable to recall the extent of her property and thought she would be unable to pay her hospital expenses. On September 18th Miss Carpenter called upon testatrix and suggested to testatrix that she straighten up her affairs. Miss Carpenter claims that the testatrix replied to the effect that she did not know an honest lawyer. in spite of her previous statement to Dr. Beattie that she wanted Mr. Rankin, whom she had known for many years, to take care of her legal matters. Thereupon Miss Carpenter suggested Mr. Richardson as an honest lawyer, and also suggested that the testatrix talk to Mr. Farwell. The next day Mr. Farwell and Mr. Richardson and Miss Carpenter went to see the testatrix, and Miss Carpenter introduced Mr. Richardson as the honest lawyer. The matter of deeds of trust and the disposition of her property was discussed. In this conversation testatrix said that she did not want to make a will; that she wanted to make a trust out of which her expenses and debts would be paid, and, in the event of her death, a payment of $2,500 to one friend and $100 to another, and the balance of her estate to be given to the Christian Assembly, all with the provision that if she got well she would want her property back. Mr. Richardson then informed her that she could not give anything to the Christian Assembly because it was a charitable institution, and stated to her, "You will have to give it to Mr. Farwell without any strings to it", and then asked her if she would be willing to make a will in the meantime that would serve until he could get the descriptions of her property and prepare a trust instrument, to which she agreed. About 1:30 that same day Mr. Richardson and his son returned to testatrix's room with the will in question. The will was then signed in the presence of Mr. Richardson and his son only. Dr. Beattie testified that at least three or four days before her death deceased was in a

comatose state; that her brain was affected by the cancer, she having developed symptoms of twitching and drooping on the right side of her face; that in his opinion deceased was not of sound mind on September 19, 1934, at the time of executing the will, and was of unsound mind for at least three or four days before her death; that for several weeks before she died she was under the influence of opiates, and that for at least three or four days prior to death she was in a comatose state. The nurses' chart showed that testatrix was given morphine on August 25, 1934, and that dosages of morphine and other opiates were continually thereafter administered every few hours until her death. For the last two or three days testatrix did not have periods of rousing when she could talk intelligently, and from the 18th through the 21st of September, 1934, she could not be roused to talk intelligently on any subject or to know who the objects of her bounty were or who her heirs were or what her property was. The doctor saw the deceased as many as five or six times a day and several times during the night during that period. Miss Margaret Powers, a registered nurse, attended deceased during the last week of her life, and testified that on the 18th, 19th and 20th testatrix was in a semi-comatose state, not conscious of what she was talking about, and that she was not of sound mind. Joseph Silva, a beneficiary under the purported will of the deceased, testified that he had known deceased for sixteen years; that he visited her at the hospital three days before her death, and that while he talked to her she did not recognize him. Mr. Roland Morrison, a San Francisco high school teacher who had known deceased since 1901 and saw her at least every other week end, testified that he last saw deceased three days before the signing of the will; that he visited her for an hour and a half and observed her closely; that she was vague in mind, had difficulty in hearing, and that deceased did not then know whether she had enough money to pay her hospital bills. Mrs. Clarabelle Coeke, a trained nurse who had known deceased since 1909 and seen her frequently for fifteen years, saw deceased in the hospital three days before the will was signed, and at that time deceased did not know anything that was going on. She did not know that the witness was there; and in the witness' opinion deceased was not of sound mind and not able to carry on

ordinary business transactions or capable of knowing what her property consisted of or the objects of her bounty. Miss Amelia Coeke, likewise an intimate acquaintance, last saw deceased about ten days before her death, and testified that deceased did not recognize her, although she waited fifteen minutes; that deceased formerly had stated to her that the Christian Assembly had grown mercenary and that Mr. Farwell was a crook. Mrs. Capey Cuff, another intimate acquaintance, testified that on visiting deceased about two weeks before she died, deceased was in a coma and did not recognize the witness.

Mr. Richardson, the attorney who drew the will, stated that testatrix positively stated she did not want to make a will, but wanted a trust instrument. According to the nurses' chart testatrix was given one-quarter of a grain of morphine approximately twenty-six minutes before Miss Carpenter saw the testatrix on September 18th, and on the day the will was signed a similar dosage was given about two and one-quarter hours before the will was signed. While the testimony of Mr. Richardson, Miss Carpenter and Mr. Farwell is to the effect that at the time of discussing the will the testatrix was of sound mind and knew what she was doing, this, of course, merely raised a conflict between the testimony of the respondents and the appellant.

The evidence introduced for respondents shows that the deceased was in the very terminal stages of cancer which had ravaged her entire body, even affecting her brain, when the will was executed; that two weeks before her death she entered into a state bordering on coma, and from that time afterwards the coma increased; that during the two weeks prior to her death she was in such a comatose state that she was unable to recognize her old friends and acquaintances; that even though worth over $20,000, three days prior to the time the will was executed she did not know that she had property to pay her hospital bills; that she was vague in mind, and did not recognize an old acquaintance whom she had known for thirty-three years and who had seen her at least once every two weeks during the time she was sick; that particularly during the three to four day period prior to her death, and during the time that the will was executed, the coma had increased to such an extent that she could not be roused enough to carry on any intelligent conversation

on any subject, and she could not be roused enough to know who the objects of her bounty were, or who her heirs were, or what her property was; that while in such a comatose state the will was executed, by the terms of which the residue of her estate was bequeathed to the appellant, a stranger in blood to deceased, whom she had not seen for at least two years, and whom she had regarded as a ''crook'', and, according to his own statement, a man whose only connection with deceased was merely to shake her hand after attending his meetings.

Appellant relies upon the testimony of the attorney who drew the will, Mr. Farwell, and Miss Carpenter as showing testamentary power in the deceased. This evidence merely raised a conflict, and the lower court was free to reject it. Questions involving motives and inferences to be deduced from facts and circumstances are, within reasonable bounds, exclusively within the province of the lower court. (*Estate of Nelson,* 134 Cal. App. 561 [25 Pac. (2d) 871].)

In the *Estate of Harney,* 103 Cal. App. 349 [284 Pac. 464], the contestant produced intimate acquaintances who testified to the incompetency of the testator and then called the doctors who testified to examinations made by them of the testator and the conclusions they formed after making such examinations to the effect that the deceased was mentally incompetent. Against this the proponents called as witnesses the two witnesses of the will, the executor named in the will, the attorney who drew the will and others, all of whom testified that at the particular time at which the will was drawn and signed the testator was of sound mind. The court there held that the testimony of contestant's witnesses, if believed, was sufficient to support the verdict of the jury to the effect that the defendant was of unsound mind.

In the case at bar it is the contention of appellant that the will was drawn during a lucid interval. However, the court found differently, and while this testimony raised a conflict, the evidence of the respondents justified the finding of the lower court.

It is true that neither physical nor mental weakness will necessarily invalidate a will. They are, however, circumstances to be considered together with all other facts

surrounding the execution of the will in determining testatrix's testamentary capacity. (*Estate of Alexander*, 111 Cal. App. 1 [295 Pac. 53].)

■ Proof of the sanity of the testator and of the facts upon which his state of mind depends are not necessarily confined to the exact time of the execution of the will. Evidence of the testator's mental status, together with his appearance, conduct, acts, habits and conversation, both before and after the execution of the will, are admissible so long as they have a reasonable tendency to indicate his mental condition at the time of the execution of the will. (*Estate of Alexander, supra; Estate of Baker,* 176 Cal. 430 [168 Pac. 881].)

The witnesses who testified to testatrix's incompetency were intimate acquaintances, and the facts which they related were not too remote and had a tendency to indicate her mental condition at the time of the will's execution. The testimony of witnesses who were present at the time of the execution of a will as to the sanity of the testatrix is not conclusive against the testimony of other witnesses who saw the testatrix within a few days of the execution of the will, and the other circumstances in the case. (*Estate of McDonald,* 191 Cal. 161 [215 Pac. 545]; *Estate of Alexander, supra; Estate of Harney, supra.*)

Under all the facts and circumstances, it cannot be said that the evidence did not support the court's finding upon the question of mental capacity.

■ On the question of undue influence, also, there is substantial evidence in the record to show that the execution of the will was not the free and voluntary act of the testatrix, but was the result of pressure which overpowered her volition at the time it was executed, and therefore the action of the trial court was authorized. In addition to the matters hereinbefore referred to upon the question of mental capacity, it will be noted that the attorney who drew the will testified that the testatrix was positive that she did not want to make a will; further, that when the testatrix stated that she wanted to make a trust in which the bulk of her property would go to the Christian Assembly, the attorney told her she could not give it to the Christian Assembly, "You will have to give it to Mr. Farwell without any strings to it." He then suggested to her that if she

would be willing to make a will in the meantime that would serve until he could prepare the trust instrument. At this time there was present Mr. Farwell, who, besides having been her spiritual adviser, was to be the recipient of her bounty, and Miss Carpenter, who was copastor in the church and who had told the testatrix that she must make some arrangements about her property. No opportunity was given the testatrix for independent advice, the attorney in question being the attorney for the Christian Assembly and for Mr. Farwell. It will be noted that the attorney did not ask the testatrix what she desired to do, or if she desired to make a will, but instead asked if she would be willing to make a will, and told her she would have to give her property to Mr. Farwell.

The appellant and Miss Blanche Carpenter each occupied a confidential relationship with the deceased at the time that the will was executed—appellant by reason of his position in the religious organization and also because of the fact that he had agreed to act as the testatrix's business agent before the will was proposed; and Miss Carpenter was the spiritual adviser of the deceased and a copastor with appellant. Other than the fact that the deceased had not had any particular contact with her relatives of late years, there was no particular reason why deceased should not consider them at the time of making her will, and the attorney testified that there was no discussion concerning the relatives. In support of the court's finding upon undue influence, the evidence establishes that Miss Carpenter suggested to the testatrix that she arrange her business affairs and suggested that she bring Mr. Farwell and an attorney to see the testatrix. Miss Carpenter informed appellant that he was to manage the testatrix's business affairs before any suggestion to that effect had come from the testatrix. The matter of making a will and the residuary legatee was suggested by appellant's attorney. An attempt was made to get the testatrix to sign a deed absolute of certain real property to the appellant which was not in accordance with the testatrix's intention. The signing over to appellant of $7,000 in building and loan accounts was likewise the suggestion of the appellant. ▆▆▆ The proper inference to be deduced from the testimony is that the acts of the attorney who drew the will, being the attorney for the appellant,

are imputable and chargeable to appellant. (*Estate of Nutt,* 181 Cal. 522 [185 Pac. 393].)

Undue influence can and usually has to be proved by circumstantial evidence. (*Estate of Snowball,* 157 Cal. 301 [107 Pac. 598].) The appellant and Miss Carpenter, who were in a position of confidential relationship to the deceased, actively participated in the preparation of the will whereby appellant profited. Deceased was extremely weakened physically and mentally when the will was executed, and in such a condition as to permit a subversion of her mind. She was under the influence of opiates, entirely surrounded by those who benefited by the will and are interested in sustaining the will; the opportunity was afforded for the exercise of undue influence, and no independent advice was given to her. The testatrix for no apparent reason disinherited her relatives.

In *Estate of Graves,* 202 Cal. 258, 262 [259 Pac. 935], the court laid down the rule concerning inferences to be drawn in a case of this character. The court said: ''Three well established facts, among others, which are recognized as being indicative of undue influence, or a subversion of a decedent's volition, stand out clearly in the record: *The relations between appellant and the decedent afforded to appellant an opportunity to control the testamentary act; the decedent's condition was such as to permit of a subversion of her freedom of will; the appellant was active in procuring the instrument to be executed.* In addition, appellant unduly profited as beneficiary under the will. While none of these circumstances, standing alone, has the effect of creating a presumption against the validity of the instrument, their probative force, in combination, is to impose upon the proponent the obligation of presenting evidence of volition, and to make the question as to undue influence one of fact for the jury's determination.'' (Citing 26 Cal. Jur., pp. 647, 648.) (Italics ours.)

The confidential relationship existing between the testatrix and the beneficiary, coupled with activity on the part of the latter in the preparation of the will, cast upon the proponent the burden of showing that the will was not the product of the imposition. (*Estate of Nutt, supra.*)

The circumstances attending the execution of a will by a testator who is dangerously ill and expecting to die, at a

time when he is surrounded exclusively by those who benefit by it, are subject to close scrutiny. (*Estate of Gallo,* 61 Cal. App. 163, 176 [214 Pac. 496]; *Estate of Nelson, supra.*)

█ The mere fact that the will was executed out of the presence of proponent does not in itself refute the charge of imposition. It is a circumstance, however, to be considered by the court, which no doubt the lower court considered. (*Estate of De Soberanes,* 182 Cal. 525, 528 [189 Pac. 103].

In the case at bar the proponent was present when the terms of the will were discussed and when the testatrix was told that she would have to give the bulk of the property to him. At the time of the execution nothing took place which gave the testatrix any opportunity for independent advice or other consideration, the attorney taking it for granted that the testatrix would sign the will in the form in which he drew it. The *Estate of Anderson,* 185 Cal. 700, 704 [198 Pac. 407], is cited as holding that where the draftsman is a reputable attorney no unfavorable presumption arises. In that case, however, the one charged with unduly influencing the testatrix did not remain in the room with the lawyer while he was being consulted about the will. Moreover, it was for the lower court to determine whether or not the circumstances as related by the draftsman were true. As said in *O'Donnell* v. *Murphy,* 17 Cal. App. 625, 633 [120 Pac. 1076]: "The most that can be reasonably claimed for the evidence is that it possibly exhibits a case in which either of two opposite conclusions might be drawn by the trial court, in which case we are bound by the conclusions of the trial court."

"Some of the facts upon which respondents rely to justify their position are indeed of slight significance, but we think it should not be held by an appellate court that the entire showing is legally insufficient to warrant the finding of [either] undue influence [or mental incompetency] . . . it is claimed that the foregoing questionable incidents were all explained by proponent [and by the witnesses present at the execution of the will] and that his explanations should have removed any implication of unfairness. It was for the . . . trial court, though, to say whether his explanation was satisfactory and to believe a part of his testimony while dis-

believing another portion." (*Estate of Ramey, supra,* at pp. 428, 429.)

There being sufficient evidence in the case to support the court's findings, these findings should stand.

Judgment affirmed.

Tyler, P. J., and Cashin, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on September 19, 1936, and an application by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on October 19, 1936.

Curtis, J., voted for a hearing on the ground that the trial court erred in dismissing the jury over the objection of the appellants.