[Civ. No. 2129.  Fourth Appellate District.—November 24, 1937.]

In the Matter of the Estate of WILLIAM H. PETERKIN, Deceased.  W. D. PETERKIN et al., Appellants, v. N. T. EDWARDS, Executor, etc., et al., Respondents.

Charles D. Swanner and R. Y. Williams for Appellants.

Head, Wellington & Jacobs for Respondents.

BARNARD, P. J.—William H. Peterkin died on November 15, 1935, at the age of 78 years, leaving an estate of the value of about $30,000. In 1929 he and his wife separated after a marriage which had lasted more than fifty years and, in 1930, they were divorced. At that time the property which they had accumulated, then worth more than $100,000, was about equally divided between them. Under his will,

dated May 12, 1931, with an holographic codicil dated September 23, 1933, he left his property to a sister, a cousin, seven nephews, five nieces and four children of nephews and nieces. The will and codicil were admitted to probate on December 6, 1935. A petition to revoke the probate of said will was filed by the three sons and three daughters of the deceased upon the ground that on May 12, 1931, and for at least a year before and at all times subsequent thereto he was of unsound mind and incompetent to make a will and upon the further ground that throughout said time he was in declining health and in an enfeebled mental condition; that he was suffering from delusions that his said children did not care for him, that they wanted him to die in order to get his property, that they were conspiring to make his home life unhappy, and that they were unfairly siding with their mother in the domestic differences which had arisen; that said delusions grew until they became a monomania which existed at the time of the signing of said will and codicil and up to the time of his death; and that said delusions were the controlling mental factors governing the making of said will and codicil.

This contest came on for hearing before a jury and the contestants have appealed from a judgment entered after a motion for nonsuit was granted at the conclusion of their evidence. Under familiar rules the question presented is whether, viewed in the light most favorable to appellants, there was any substantial evidence which would have supported a judgment in their favor.

All of the appellants testified that they considered that he was of unsound mind on May 12, 1931, and September 23, 1933, and gave their reasons therefor. One son testified that in 1899 or 1900, when he was four or five years old, the decedent horsewhipped him and then horsewhipped his mother when she came to his aid; that a year or two later he horsewhipped him and his sister; and that when he was about thirteen years old his father struck him and knocked him down and when his mother interfered struck her with his fist. He told of several acts of cruelty on the part of the decedent toward his horses which occurred about the same time; that in 1917 he went to France and his father never wrote to him while he was away; that in 1924 he was in a hospital with a broken leg and his father did not go near him;

and that the decedent frequently cursed his mother and threw things at her. He further testified that after his father and mother separated he never went to his father's house, had nothing to do with him, had no conversations with him, and knew nothing of his business dealings or transactions after 1930. Another son related a series of acts commencing as early as 1900, consisting of horsewhipping his children, fits of rage during which he would whip his wife and children, brutality with his horses, and threatening the witness with a gun. He also testified that his father signed a note for $1,000 for him and another for $2,000 for his son, which the father paid in 1930 or 1931; that prior to the divorce he told his father that he would have to side with his mother; that from that time he never had any conversations with him; that his father transacted his own business and accumulated considerable wealth; that he was a hard worker, took good care of his groves, and accumulated something over $100,000 between 1904 and 1929; that he did not consider that his father used bad judgment in a business way; and that at the time of the divorce a proposition was submitted by which the property was divided and his mother was offered a choice as to which she would take. The wife of this witness testified that the decedent attempted to caress her in the year 1916, that she had seen him in numerous rages when he would curse his wife and children, and that on one occasion he threatened her husband with a gun. Another son told of his father's horsewhipping his children, of his brutality in striking horses, of his threatening to put dynamite in a wagon in which the witness was living, of his padlocking a gate, a storehouse and garage, and of his drawing a gun on one of his sons. He also testified that he visited his father after the divorce and up to the time he died; that on some of these occasions his father was normal and they "got along fine" and at other times, after a few words, his father would go off in one of his rages; that many times they visited together and his father was perfectly normal; that his father took good care of his orange groves and carried on his business transactions; that on his visits they would have a general conversation, talk about something from a newspaper or "whatever it was"; that during all of these conversations his father knew who he was, knew what his own properties were and who his children were; and that ever since

he was a child he had thought "more or less" that his father was of unsound mind.

A daughter of the decedent testified to a course of conduct over a long period of years, including horsewhipping his wife and children, an undue familiarity with the witness prior to 1904 when she was ten or eleven years of age, a jerking of his head which had become prominent as early as 1927, and that his fits of rage continued up to the time of his death. She also testified that in domestic arguments which arose she took sides with her mother; that he took good care of his ranches; that he transacted his business right along from as early as she could remember; that he nearly always had advice from a lawyer or from a banker; that she never visited him after he separated from her mother; and that the last time she spoke to him was in 1929. Another daughter testified that she left home in 1915 when she was married; that on several occasions a number of years before that her father improperly placed his hands upon her; that he would do the same thing with other girls who came to the house; that in 1911 he threw his wife to the floor when she wanted to go to her mother's funeral; that in 1913 when her mother was sick he accused her of not being sick; that she based her opinion that her father was of unsound mind entirely upon these things which had occurred before she left home; and that she did not visit him very much after she left home because she never felt like being around him. Another daughter related a series of events beginning as early as 1902 consisting of horsewhipping his children, fits of rage when he would curse his wife and children, brutality to his horses, throwing dishes at the witness, and accusing his children of giving away his things and "bleeding him of all his money". She testified that she never had a conversation with him after her parents separated.

Of the witnesses who were not members of the family one testified that she had known the decedent since 1929, often invited him to dinner, and saw him frequently until the day of his death. She gave as her reasons for thinking he was of unsound mind that he used to shake his head and mumble to himself a great deal; that he told her he was going to commit suicide; that he would neglect his orchard and spend his time picking berries; that he always talked about girls; that he told her at one time that he loved no woman except

his wife and at another time that he hated his wife and wanted to get rid of her; that he carried pictures of two girls in a nudist colony; and that he told her he liked to go to the beach and watch the girls in bathing. She also testified that she asked and accepted his advice about her orange trees, that he talked intelligently about business, and that during their frequent visits, aside from the matters above related, he talked intelligently to her. Another witness testified that, with the exception of two years, he purchased the decedent's orange crop each year from 1921 until the date of his death; that he formed the opinion that the decedent was of unsound mind in 1924 or 1925; that he continued to do business with him; that the decedent knew what he was doing and the price he was obtaining for oranges; that decedent would attend to a berry patch and neglect his oranges; that on occasions he could not remember the number of boxes of fruit taken from his orchard and the witness would have to correct him; that decedent would mutter to himself; that in 1924 or 1925, when asked about his son who had been injured, he replied that he did not care whether his son died or not; that he would object to fruit contracts but would accept them when rewritten practically the same way; that he was a hard man to deal with; and that he was always talking about women and sex. Another witness testified that he had known the decedent about eleven years; that he had transacted business with him during the last three years of his life, during which he saw him nearly every day; that the decedent was very erratic but that he could not say he had formed any opinion as to whether he was of sound or unsound mind.

Three doctors testified. One said he treated the decedent beginning in July, 1931, when he fell and fractured his pelvic bone, that for several weeks he was in the hospital and the witness saw him nearly every day. He expressed the opinion that the decedent was not "of good sane, reliable mind" at that time and that he had senile dementia and delusions of persecution from members of his family and friends. On cross-examination he stated that he was not told of the difficulty decedent had had with his family in 1930, and when asked if he based his opinion that decedent was of unsound mind "on the proposition that he refused to see his son, William Peterkin, and made the statement that he would be

damned if he would allow any of them to come into his room, and his refusal to cooperate such as you believed that he should do under the conditions, and his impatience under restraint'', he replied: ''Yes, I think that expresses it as near as one can.'' When asked whether the decedent knew what he was doing and what was going on while he was in the hospital, he answered: ''Very much.'' Another doctor testified that he treated the wife of the decedent between 1928 and 1930; that he talked to decedent in April, 1930, and again in June, 1930; that in his opinion the decedent was a victim of senile dementia; that his reasons for this belief were the attitude of the decedent and the results of conversations with him concerning his wife; that senile dementia is a relative term and a person may be of unsound mind on some subjects and be shrewd on other subjects; that he inferred from his conversations with the decedent that he had the idea that his family were intent on stripping him of his resources; that the decedent told him that his wife's illness was entirely in her own mind and that it was unnecessary for her to incur the expense of hospital care; and that the decedent told him that his children were in cahoots with the mother and sympathized with her and if he didn't watch his step ''they would ruin him for all he had''. Another doctor, who had never seen the decedent, testified, in answer to a hypothetical question enumerating many of the acts and conduct of the decedent over a period of years, that in his opinion such a man was suffering from progressive senile dementia with maniacal outbursts of anger, with gradual evidence of a depressed mental attitude; that such a person has hardening of the arteries which terminates in senile dementia; that such a person is bound to have an erratic and unstable mind and is apt to form opinions that certain persons hate them or that they hate certain persons over imaginary offenses; that such persons are inclined to have unnatural ideas of love; and that senile dementia is not a type of insanity that comes overnight any more than old age comes overnight. On cross-examination he testified that his opinion as given was a medical opinion and that he would naturally be in a better position to express an opinion regarding a person's senility if he was able to discuss with that person business and other transactions. He was then given certain facts corresponding to the actions of the decedent after 1929, covering such mat-

ters as the way he had carried on his business transactions, and asked whether he considered these an indication of an advanced stage of senile dementia. He replied that he would say these acts did not indicate an advanced stage, that such a man might have mental streaks in which he was very calm and might have a greatly distorted mind, that these additional facts would not indicate senile dementia and then said: "Senile dementia must not be confused with insanity. . . . It is a progressive evidence of mental failure and those acts I couldn't possibly describe as that."

The appellants argue that this evidence, with the fact that the will was unnatural in that it disinherited his children, was sufficient to establish that the testator was suffering from senile. dementia, a progressive mental disease, and that he was suffering from delusions that his children were persecuting him or attempting to take his property from him, and that he would not have made the will except for these delusions.

■ "The law is well settled in this state that a testator is of sound and disposing mind and memory, if, at the time of making his will, he has sufficient mental capacity to be able to understand the nature of the act he is doing, and to understand and recall the nature and situation of his property, and to remember and understand his relations to the persons who have claims upon his bounty, and whose interests are affected by the provisions of the instrument." (*Estate of Bemmerly*, 110 Cal. App. 550 [294 Pac. 33, 37].)

"It must be borne in mind that it is not every weakness and impairment of the faculties of the testator that will invalidate a will. Even where a testator is feeble in health, suffering under disease and aged and infirm, yet if he was of sufficiently sound mind to be capable of understanding the nature and situation of his property, and of disposing thereof intelligently, without any delusions affecting his action, he had sufficient capacity to make a will." (*Estate of Casarotti*, 184 Cal. 73 [192 Pac. 1085].)

The general principles applicable here are thus set forth in *Estate of Perkins*, 195 Cal. 699 [235 Pac. 45]:

"It is well settled that, upon the contest of a will on the ground that the deceased was of unsound mind, the actual mental condition of the testatrix *at the time of the execution of the will* is the question to be determined. (Citing cases.) Evidence as to mental condition before or after the execu-

tion of the will is important only in so far as it tends to show mental condition at the time of the execution of the will. The presumption is always that a person is sane, and the burden is always upon the contestants of the will to show affirmatively, and by a preponderance of the evidence, that the testatrix was of unsound mind at the time of the execution of the will. (Citing cases.) Insanity exists as a matter of law only from the time it is shown to exist and proof of subsequent insanity will not create nor carry a presumption of its past existence. (*Estate of Dolbeer, supra,* 149 Cal. 227 [86 Pac. 695, 9 Ann. Cas. 795].)

"Every mental departure from the normal will not destroy a testamentary disposition, otherwise valid, of the testatrix' estate. It is not the rule of law that no person who is insane may make a valid will. The real rule is that the will of a person, who by reason of insanity is incapable of making valid testamentary disposition of his estate, shall not be upheld. (*Estate of Chevallier,* 159 Cal. 161 [113 Pac. 130]; *Estate of Wasserman,* 170 Cal. 101 [148 Pac. 931].)

"Mental derangement sufficient to invalidate a will must be insanity in one of two forms: (1) insanity of such broad character as to establish mental incompetency generally, or (2) some specific and narrower form of insanity under which the testator is the victim of some hallucination or delusion. Even in the latter class of cases, it is not sufficient merely to establish that a testator was the victim of some hallucination or delusion. The evidence must establish that the will itself was a creature or product of such hallucination or delusion; that the hallucination or delusion bore directly upon and influenced the creation and terms of the testamentary instrument. The evidence must establish, in addition to the fact of the existence of the hallucinations or delusions, the fact that by reason of these hallucinations or delusions the testatrix devised or bequeathed her property in a way which, except for the existence of such delusions, she would not have done. In short, the abnormality of mind must have had a direct influence upon the testamentary act."

We are unable to agree with the contention that this was an unnatural will under the circumstances, although no provision was made for the testator's children. Irrespective of whose fault it was, he was not on friendly terms with his children, they had all sided with their mother in the rather

recent divorce proceeding, he had turned over to his wife approximately half of his property at that time and it cannot be said that it was an unnatural thing for him to give no more to that part of his family.

While the evidence indicates that the testator possessed many qualities which are not admirable, it is far from sufficient to show general mental incompetency at the time the will was made or that he did not then have sufficient mental capacity to understand what he was doing and to understand and recall the nature and situation of his property and his relations to the persons who had a natural claim on his bounty. His will names his six children and states that he makes no provision for any of them or for his former wife "purposely and for reasons that I consider good and sufficient". He gave varying amounts to eighteen of his other relatives, naming them and naming their relationship to him. Most of the evidence relates to things which occurred long before the time which is in question and is of a character which, while indicative of other things, does not show lack of testamentary capacity. It appears without conflict that he worked hard, cared for his ranch properties and handled his business until a short time before his death and long after the will was made. None of the children visited him after the parents separated except one son and his evidence in no way indicates that the testator was without testamentary capacity at the time those visits were made. We find no evidence in the record which would have supported a finding of insanity in its general broad sense of mental incompetency.

Nor do we think the evidence would support a finding that this will was the result of delusions on the part of the testator that his children were persecuting him and that they were attempting to take his property from him. The only evidence of delusions is found in the testimony of the doctors. The doctor who had been treating the testator's wife during a period immediately preceding and following the divorce drew the inference from his conversations with the testator that he was laboring under the idea that his family were intent on stripping him of his resources. He had just turned over half of his property to his wife, he knew that the children were siding with her, and he had paid $3,000 about that time on notes which he had signed for his son and grandson. The doctor who treated him when he broke a bone in

July, 1931, expressed the opinion that he then had senile dementia and delusions of persecution on the part of members of his family and friends. In support of his conclusion he stated that the testator refused to have company, refused in particular to have any of his children visit him, and insisted upon being allowed to sit up and otherwise refused to cooperate with the nurse. This was after the will was executed and, whatever else may be said of it, it indicates that he had considerable strength of mind left. The testimony of the other doctor, who replied to hypothetical questions when given facts corresponding to the actions of the testator after 1929, admitted that many of these acts could not be described as indicating an advanced stage of senile dementia. There is little, if any, evidence that he had any delusions about his children at any time. They had taken their mother's part in the domestic difficulty and with one exception had not visited with him or talked with him after that separation. The only inference possible from the evidence is that most, if not all, of the children felt unfriendly toward him and that he entertained a like feeling toward them. No matter whose fault it was, there was a strong factual background to the entire situation and in our opinion there is nothing in the evidence, taken in the light most favorable to the appellants, which would have supported a judgment in their favor based upon a finding, express or implied, that this will and codicil were the result of any such delusions as those relied upon by the appellants. Viewed in its entirety, the evidence fails to show that the testator on the dates in question was without testamentary capacity or that he was suffering from delusions which led to a result which he would not otherwise have intended.

For the reasons given the judgment is affirmed.

Marks, J., and Jennings, J., concurred.

A petition by appellants to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on January 20, 1938.