[Civ. No. 12431. First Dist., Div. Two. Aug. 25, 1943.]

Estate of HILDA SUSANNA DUPONT, Deceased. HUGO HOVANDER et al., Respondents, v. MRS. H. J. LAMB et al., Appellants.

Gordon J. McKenzie, H. W. McGowan, Geary & Tauzer and A. Dal Thomson for Appellants.

Clarendon W. Anderson for Respondents.

DOOLING, J. pro tem.—This is an appeal from a judgment refusing probate of an alleged will of Hilda Susanna Dupont, upon a finding of the court that the deceased was not of sound and disposing mind at the time the instrument was executed.

The proffered instrument was executed by the decedent on December 19, 1940. At that time the decedent was seventy-seven years of age and confined to her bed in a sanitarium, extremely weakened and seriously afflicted by the disease which caused her death on January 3, 1941.

Decedent, a native of Sweden, came to California as a young woman and lived during the rest of her life in this

state. She was twice married but both of her husbands predeceased her, she had no children and at the time of her. death her legal heirs consisted of a brother, Charles Eric Leaf, living in Wisconsin, and nieces and nephews, the children of a predeceased sister. Her relations with these relatives had generally been friendly up to the time of the onset of her final illness. She was apparently a prolific letter writer and many letters to certain of her nieces and nephews and their children, couched in cordial and affectionate terms, were introduced into evidence. It may fairly be said from the evidence that up to a very short time before the execution of the proffered will, the contestant Elsa Stromee had been her favorite niece. Because she lived in California Mrs. Stromee had been able to, and had, visited and seen her aunt with more frequency in the last few years of her life than any of the others. Within the year decedent had taken Mrs. Stromee to the office of her attorney and stated to the attorney that Mrs. Stromee was to be the executrix of her will, and by the terms of an earlier will, unrevoked if the proffered instrument was properly denied probate, Mrs Stromee besides being named executrix was bequeathed a substantial share of her aunt's estate.

For some days prior to November 27, 1940, decedent had been a patient in the General Hospital in Santa Rosa. On the morning of that day she left the General Hospital, because of dissatisfaction with her treatment there, and went to the home of an old friend, Mrs. H. J. Lamb. At that time she was very ill. She remained at Mrs. Lamb's home until the morning of November 30. On that morning at 4 a. m. she awakened Mrs. Lamb and asked Mrs. Lamb to call a taxi, or to call a messenger boy to send a message to Mr. Hollingsworth, her attorney, to come to see her so that she could ask him to get her some money from the bank. Mrs. Lamb explained to her that this was impossible at that early hour of the morning. Although she had only one dollar with her, she had not previously mentioned to Mrs. Lamb that she needed any additional funds. A little after six o'clock Mrs. Lamb went to a neighbor's house and telephoned for a messenger. She reported to Mrs. Dupont that there would be no messenger boy on duty until eight o'clock and Mrs. Dupont then asked her to cancel the order for the messenger and call a taxi. Mrs. Lamb, after calling the cab, helped Mrs. Dupont to dress, and when the cab arrived Mrs. Dupont was driven to the home of Mr. Hollingsworth. She arrived at Mr. Hollings-

worth's home between seven and eight o'clock, while he was still asleep. She was wearing a bathrobe. Mr. Hollingsworth went to his office between eight and nine o'clock and when he returned at noon Mrs. Dupont was still in his home. He could see that she was "a pretty sick woman" and he arranged to take her to the Northside Sanitarium where she remained until her death.

The same day Mr. Hollingsworth sent a telegram to Mrs. Stromee advising her of her aunt's serious illness and Mrs. Stromee came to Santa Rosa to be with her aunt, arriving on December 2 and staying until December 5. Upon her arrival Mrs. Dupont asked Mrs. Stromee to get a cot and sleep outside her door. Mrs. Stromee replied that she was tired from her trip and needed a good night's rest. At a later time Mrs. Dupont again asked Mrs. Stromee to lie on a cot outside her door during the nights so that she could attend her if necessary. Instead Mrs. Stromee insisted on employing a night nurse for her aunt, at which the aunt became irritated and displeased. During this period the aunt procured Mr. Hollingsworth to get $100 in cash for her from her bank account. This money was left in a handbag in a drawer in Mrs. Dupont's room and without any clear ground for the accusation Mrs. Dupont conceived the idea that Mrs. Stromee had stolen most of it.

Mrs. Stromee left for home on December 5 and her aunt asked her to take her with her. Her physical condition, as hereinafter described, was such as to render a trip of several hundred miles to Mrs. Stromee's home extremely dangerous to her, if not physically impossible, but Mrs. Dupont was annoyed when Mrs. Stromee told her that she could not take her.

There is evidence from which the court could conclude that after being annoyed at and unfriendly toward Mrs. Stromee for several days following her departure Mrs. Dupont suddenly changed her attitude completely and asked Mrs. Brandborg, an attendant at the sanitarium, to telephone Mrs. Stromee and ask her to return. Mrs. Stromee returned on December 15 and entered her aunt's room with her husband, Carl, who had driven her to Santa Rosa. She said to her aunt: "Wasn't Carl a darling to bring me up here so fast?" The aunt who had always theretofore been friendly to Carl and who had never before used profanity in her niece's presence, replied: "To hell with Carl," and thereafter refused to have anything to do with him.

As suddenly as Mrs. Dupont had changed her mind and sought Mrs. Stromee's return, she again turned against her when she did come back at her request. She said to her on one occasion about December 17: "I suppose you are sending me to a crazy house." No apparent reason appears for this remark in any conduct of Mrs. Stromee, and it is not explicable on any logical ground, unless it was suggested to Mrs. Dupont by her own realization that her mind was no longer normal.

Another incident in the relation between aunt and niece seems to deserve special comment. Some years before Mrs. Stromee's mother had died after the amputation of a leg. Mrs. Stromee had previously told Mrs. Dupont that none of the children had wanted the amputation performed, but that their mother had insisted on the operation over their objection, saying: "I am boss, it is my leg, I can do what I please. The doctor told me I can live ten more years if it is performed and I will go through with it." Sometime during the period December 15 to 17, Mrs. Dupont said to Mrs. Stromee: "You have my sister's blood on your hands. . . . You are not going to kill me that way."

Turning from Mrs. Dupont's relations with her niece to her general physical and mental condition from the time of her arrival at the sanitarium, we find from the medical testimony that she was suffering from very advanced arteriosclerosis and a severe organic valvular heart lesion, the valves of the heart were involved in a degenerative process, the blood circulation as a consequence was sluggish, the blood was dammed back in the lungs and as a result she suffered a great deal of pain, developed a severe cough, her respiration and pulse were abnormally high, she could only speak with an effort because of shortness of breath and at times she suffered from Cheyne-Stokes respiration. Her condition was very advanced and serious, she was incurable and it was only a matter of time when she would die. Dr. Carlson, whose testimony is later discussed at greater length, was her attending physician at the sanitarium. He found her irrational at times and rational at others prior to December 19, the date of the execution of the will.

During her stay at the sanitarium and before the execution of the proffered will Mrs. Dupont was too weak to get out of bed unassisted although she was assisted to a commode for the first few days. She was incontinent at times and did

not realize that fact. She took ice from a rubber icebag and put it in a knitted cap and put the knitted cap containing the ice on her head, insisting that she preferred it that way. She would ask to be placed on the commode when she had just used it and insist that she had not. She said that she had herself made the concrete slab on her cemetery plot. She asked to have the undertaker open her grave so that it would be ready for her when she died. She wanted the doctor sent for to spend the night with her. She wanted to take an entire bottle of medicine at one time. She tore a nightgown which the nurse wished to put on her. She screamed at night without apparent reason. She told Mrs. Brandborg that she had gone into the corridor to die and that Mrs. Brandborg ''had committed a great sin by dragging her out of her grave.'' She asked the doctor to call the undertaker because she was going to die. She asked Mrs. Brandborg to telephone to the storage house where her furniture was stored and have them look through her furniture for a pencil sharpener because she wanted to write a letter. A large part of the time she talked irrationally and incoherently. She complained that she could not remember anything and that she could not think any more.

Specifically several witnesses called for the contestants testified that in their opinion decedent before and on the day of execution of the proffered instrument was irrational or of unsound mind. Mrs. Brandborg, who assisted in caring for Mrs. Dupont at the sanitarium, testified that during all the time she was there she was of unsound mind and gave as some of her reasons: Her speech was rambling at times; on several occasions she talked like she was in a coma; she would look at the ceiling and say she was going to heaven; ''she told me that I had committed a great sin by dragging her out of the grave, she came there in the corridor to die and I was the instrument of getting her back to earth''; ''she asked the doctor one time to call the undertaker because she was going to die on the occasion of the doctor's visit''; she was incontinent in the bed and didn't realize that she had been; she wanted the storage man to search through her furniture for a pencil sharpener because she wanted to write a letter.

Mr. Brandborg, also an employee of the sanitarium, likewise testified that all the time decedent was in the sanitarium she was in his opinion of unsound mind. Some of the reasons given were: Putting ice from an icebag into a knitted cap; she couldn't talk coherently; she insisted on using the com-

mode when she had just finished using it and would insist that she had not done so; she screamed on many occasions so loudly as to disturb other patients and then denied that she had done so; she wanted the doctor called to stay with her saying she had plenty of money to pay him to stay with her all the time and was annoyed when Mr. Brandborg pointed out that the doctor had other patients and could not do that; she said that the nurse had not been in her room all night when the nurse had spent the night there; she wanted to take a whole bottle of medicine which the doctor had prescribed to be taken in doses a teaspoonful at a time; she told him that she herself had made the concrete slab on her grave.

Mrs. Nobles, a night nurse who was with Mrs. Dupont each night from December 3 to December 12, described her appearance and conduct variously as irrational at times; not mentally clear; childish and eccentric; erratic and mentally clouded.

Mr. Batt, neighbor and acquaintance of many years, visited Mrs. Dupont twice at the sanitarium. On the first visit Mrs. Batt was with him; on the second visit he was alone. The second visit was after Mrs. Stromme's return—after December 15. On the second visit Mr. Batt found Mrs. Dupont irrational. Reasons: "she didn't recognize me when I came in"; "she talked wandering like . . . she didn't know what she was talking about, just one thing and another"; "she was so much different than she was when we used to see her out there."

Mr. Churchman, a real estate agent who sold Mrs. Dupont's ranch for her during her illness, saw her successively in the General Hospital, at Mrs. Lamb's and in the Northside Sanitarium. When he saw her in the General Hospital "she was fairly strong"; at Mrs. Lamb's "I wouldn't say that she was of unsound mind but it is hard for me to say that she was of sound mind. . . . My reasons, I have known her for a good many years and she was always very keen, and at that time she wasn't normal in that respect . . . she wasn't keen." When he saw her last in the sanitarium he testified: "I don't think she was of sound mind." His reasons were based upon his observation of Mrs. Dupont for several years, the marked change that had come over her, her appearance and conversation; her failure to remember where she had put the keys to her house and her confused manner in looking in her bag for them and her saying: "I just can't think any more."

"She said she couldn't think, she couldn't appear to think properly."

A few hours before the proffered will was drawn and executed, and on the same day, Mrs. Dupont wrote a letter to her brother. It was written partly in English and partly in Swedish. This letter with the Swedish words translated into English reads as follows:

"Dear Brother this is my last letter to you Elsa are a rotten sister have nothing to do now with her she has killed me she has stolen all my hard earned money pretend not you receive this letter be so kind. Elsa is rotten sister to take all my money so have nothing to do with her so good bye. I not help but give all what I have to my nurse. My lawyer will see to it tend to it all—God bless you for all you have ever done for family. Good bye do not have to with Elsa we better not have anything with Elsa My nurse Mrs. sure done all to make me comfortable to scutt Elsa out Bye Bye Dear Brother."

At the time of the preparation of the will in her sickroom the testimony shows that Mrs. Dupont first said that she wanted her brother to have half of her estate and Mrs. Lamb to have the other half. Then she said: "I want to give something to that nurse," pointing to Mrs. Reid. When asked how much she replied "all she is worth." She was then asked: "How much is that?" Her reply was: "Well, if there is five thousand dollars give it to her, if there is five thousand dollars give it to her." The will was first drawn to leave $5,000 to Mrs. Reid, and later on the suggestion of the draftsman that that was a large sum to leave to a nurse whom she had only known for a few days, Mrs. Dupont at the prompting of the draftsman reduced the bequest to $1,000.

In evaluating this evidence certain well settled rules are to be borne in mind.

A testator has sufficient capacity to execute a will if he has sufficient mentality to understand and keep in mind the nature of his act, the extent and character of his property, and the persons who are the natural objects of his bounty. (*Estate of Sexton,* 199 Cal. 759 [251 P. 778]; *Estate of Finkler,* 3 Cal.2d 584 [46 P.2d 149]; *Estate of Arnold,* 16 Cal.2d 573 [107 P.2d 25].) Testamentary incapacity because of unsoundness of mind is of two classes, "either insanity of such broad character as to establish mental incompetency generally, or some specific and narrower form of insanity, under which the testator is the victim of some hallucination

or delusion. And, even in the latter class of cases . . . the evidence must . . . establish that the will itself was the creature or product of such hallucination or delusion, or, in other words, that the hallucination or delusion bore directly upon and influenced the creation and terms of the testamentary instrument.'' (*Estate of Chevallier*, 159 Cal. 161, 168 [113 P. 130].)

The opinions of lay witnesses as to the mental unsoundness of the testator are no stronger than the reasons given for them and must stand or fall on the strength or weakness of the reasons given. (*Estate of Nolan*, 25 Cal.App. 2d 738 [78 P.2d 456]; *Estate of Finkler*, 3 Cal.2d 584 [46 P.2d 149].)

Subject to these rules the function of the appellate court is no different on an appeal from a judgment refusing probate to a will because of mental incompetency than in any other case. If there is any substantial evidence to support the judgment it must be affirmed on appeal. (*Estate of Pessagno*, 58 Cal.App.2d 390 [136 P.2d 644] and cases cited at 392.)

Tested by these rules we are satisfied that the judgment must be affirmed. We may concede, without expressly so deciding, that the evidence is not sufficient to support a finding that the proffered will was the product of an insane delusion or hallucination of the decedent concerning her niece Elsa Stromee. We may likewise concede that the evidence as to all that occurred prior to the time immediately concurrent with the purported execution of the proffered will might not be sufficient to support a finding of general testamentary incapacity. But that evidence furnishes an illuminating background for the scene that was enacted in Mrs. Dupont's sick room on December 19, at the time that the purported will was actually drafted and signed.

While neither extreme age nor physical or even mental weakness standing alone may be sufficient to invalidate a will, they are circumstances which should be considered together with the facts immediately surrounding the execution of the will in determining whether the testator possessed testamentary capacity. (*Estate of Alexander*, 111 Cal.App. 1, 6 [295 P. 53]; *Estate of Miller*, 16 Cal.App.2d 154, 164 [60 P.2d 498].)

The evidence presents a picture of a woman seventy-seven years old, always theretofore mentally alert and self-reliant,

who, under the ravages of a fatal illness, commencing on November 27, when she awakened her friend at 4 a. m. to call a cab or a messenger boy immediately so that she could at once arrange to get some money, thereafter engaged in conduct bizarre, eccentric, extravagant and out of all character with her previous demeanor and way of life. Culminating these marked extravagances, and within a few hours of the drafting and signing of the proffered will, this slowly dying woman who has exhibited so many of the pitiful vagaries of a failing mind, writes a letter to her brother which, measured by the standards of her earlier correspondence in the record, is ill-constructed, labored, repetitious and confused. In addition to a rambling and unjustifiably bitter complaint against Elsa Stromee, it contains the statement: "I not help but give all what I have to my nurse." It is noteworthy, in this connection, that Mrs. Dupont had met this nurse for the first time on the night of December 12, that she apparently did not know her name, that the nurse had been on duty with her at that time during only four nights and two and one-half days, and by her own testimony had never engaged in any conversation with Mrs. Dupont except such as was necessary in the performance of her duties for her patient.

Thus the stage is set for the events immediately surrounding the preparation and signing of the purported will. ■ It is axiomatic that the critical inquiry in determining the mental capacity of a person to execute a will is directed to his condition of mind at the very time of its signing. ■ Evidence of his previous conduct is only admissible for the light that it may throw on his condition of mind at that precise moment. (*Estate of Perkins*, 195 Cal. 699 [235 P. 45] ; *Estate of Peterkin*, 23 Cal.App.2d 597 [73 P.2d 897] ; *Estate of Miller*, 16 Cal.App.2d 154 [60 P.2d 498].) From proponents' own witnesses it appears that when the will was being drafted in Mrs. Dupont's sick room she first stated that she had $19,000 in the Exchange Bank and a smaller amount in Postal Savings (which was the fact) and as a part of the same conversation she stated that she wanted to leave "all she is worth . . . to that nurse" (pointing to her) and on being pressed to state the amount she replied: "if there is $5000 give it to her, if there is $5000 give it to her."

■ The weight and effect of this evidence was for the trial judge. From it he could reasonably find that Mrs. Dupont at that time was so mentally deranged or confused that

she did not realize that $19,000 was more than $5,000. If this was so it is clear that Mrs. Dupont at the time of the will's execution did not have sufficient mentality to understand the extent and character of her property. The finding that Mrs. Dupont was not of sound and disposing mind finds sufficient support in this one incident, particularly when viewed against the background of failing mentality portrayed by the other evidence.

The argument that Mrs. Dupont's statement: "if there is $5000 give it to her" is susceptible of explanation compatible with testamentary capacity cannot avail appellants in an appellate court. Our inquiry ends when we determine that it furnishes substantial support for the trial court's finding, and we cannot reweigh the evidence or draw different inferences from it on appeal.

Appellants emphasize the evidence of Dr. Carlson, Mrs. Dupont's attending physician, that in his opinion she was of sound mind on December 19. A reading of Dr. Carlson's testimony shows that he had no independent recollection of the condition of mind of Mrs. Dupont on December 19. He concluded from a conversation that he had with her on December 20 that on December 19 she was of sound mind, but on cross-examination it was developed that he did not discuss with her the terms of her will or ascertain whether she remembered or understood them. He based his conclusion entirely on a statement by her that she had made a will the day before and was satisfied with it, and he further testified, as hereinbefore noticed, that prior to December 19 she had been at times rational and at others irrational. Under the circumstances the trial judge was not bound to accept his opinion of the condition of his patient's mind at the moment of the will's execution.

To appellants' argument based on such cases as *Estate of Casarotti,* 184 Cal. 73, 78 [192 P. 1085], that the testimony of proponents' witnesses must be taken into account in weighing the sufficiency of contestants' evidence it is sufficient to point out that the precise evidence of Mrs. Dupont's conduct and statements immediately preceding the execution of the will, which we have held sufficiently supported the trial court's finding, came from proponents' witnesses including the draftsman and the attesting witnesses of the document itself.

After Mrs. Dupont's death Mrs. Stromee consulted Mr. Tauzer, an attorney-at-law, with a view to employing

him as her attorney to contest the will. At the close of the interview Mr. Tauzer refused the employment. It was sought to prove by Mr. Tauzer that during this interview Mrs. Stromee made statements to Mr. Tauzer inconsistent with her testimony. The trial court sustained an objection on the ground of privilege. It is claimed that this was error. In this connection appellants point to the language of Code of Civil Procedure, section 1881, subdivision 2 which extends the privilege to communications between attorney and client "in the course of professional employment" and argue that since Mr. Tauzer refused the employment the situation falls without the language of the section. They also rely on *People* v. *Heart,* 1 Cal.App. 166, 169 [81 P. 1918].

It is the almost universal rule in common law jurisdictions that "Where a person consults an attorney with a view to employing him professionally, any information acquired by the attorney in the course of interviews or negotiations looking toward such employment is privileged and cannot be disclosed, even though no actual employment of the attorney as such follows, and notwithstanding the attorney may be afterward employed by the adversary of the person who made such communication." (70 C.J. 406; 8 Wigmore on Evidence, 3d ed. (1940) sec. 2304, pp. 587-8; 5 Chamberlayne, Modern Law of Evidence (1916) sec. 3682, p. 5266; cases, collected in notes in 21 Ann.Cas. 217; Ann.Cas. 1913A 30; and 34 L.R.A.N.S. 578-9.)

The Supreme Court of Colorado in *Denver Tramway Co.* v. *Owens,* 20 Colo. 107 [36 P. 848] was called upon to apply a statute identical in language to our own to facts similar to those presented here. That court said at page 855:

"If a person in respect to his business affairs, or troubles of any kind, consults with an attorney in his professional capacity, with the view to obtaining professional advice or assistance, and the attorney voluntarily permits or acquiesces in such consultation, then the professional employment must be regarded as established, and the communication made by the client, or advice given by the attorney, under such circumstances is privileged. An attorney is employed—that is, he is engaged in his professional capacity as a lawyer or counselor—when he is listening to his client's preliminary statement of his case, or when he is giving advice thereon, just as truly as when he is drawing his client's pleadings, or advocating his client's cause in open court. It is the consultation between attorney and client which is privileged, and which

must ever remain so, even though the attorney, after hearing the preliminary statement, should decline to be retained further in the cause, or the client, after hearing the attorney's advice, should decline to further employ him.''

As has been pointed out in other cases, no person could ever safely consult an attorney for the first time with a view to his employment if the privilege depended on the chance of whether the attorney after hearing his statement of the facts decided to accept the employment or decline it.

We are satisfied that the language of Code of Civil Procedure section 1881, subdivision 2, is broad enough to extend the privilege to preliminary statements to an attorney in good faith looking to his engagement, and that to give it the construction contended for by appellants would unduly restrict its scope and largely destroy the protection to persons consulting lawyers which is its policy and purpose.

The case of *People* v. *Heart, supra,* insofar as it may lend support to appellants' argument on this point is supported by no citation of authority. The facts were distinguishable. There a wife sought to employ an attorney to defend her husband and after hearing her statement he declined the employment. He was called to impeach the wife not the husband. The court said:

''The inhibition does not extend to communications between the attorney and persons having social or business relations with the client. Certainly not, when the statement did not purport to be conveyed to the attorney from the client, but, on the contrary, was the representation of a witness as to her knowledge of the transaction.''

We are not here called upon to apply the law to a situation such as there disclosed and discussed. The court did state in one sentence of the opinion: ''There is no claim that Appel was ever employed or retained.'' If the court by that single sentence may be said to have held that communications by a party to an attorney whom he is seeking to engage are not privileged it was dictum on the facts of that case, and a dictum which we expressly refuse to follow for the reasons herein stated.

Counsel for appellants, Hollingsworth, Reid and Lamb claim that the trial judge committed prejudicial error in questioning various witnesses, and in admonishing counsel not to interrupt witnesses before their answers were complete. In this specification counsel for the other appellants expressly

refused to join. A reading of the entire record satisfies us that the case was fairly tried, and that the trial judge did not exceed the proper bounds either in seeking to elicit the facts or in maintaining the orderly procedure of the trial. It apparently cannot be repeated too often for the guidance of a part of the legal profession that a judge is not a mere umpire presiding over a contest of wits between professional opponents, but a judicial officer entrusted with the grave task of determining where justice lies under the law and the facts between the parties who have sought the protection of our courts. Within reasonable limits, it is not only the right but the duty of a trial judge to clearly bring out the facts so that the important functions of his office may be fairly and justly performed. (*People* v. *Mendez,* 193 Cal. 39, 45-6 [223 P. 65]; *People* v. *Butterfield,* 40 Cal.App.2d 725, 731 [105 P.2d 628]; *People* v. *Salas,* 17 Cal.App.2d 75, 79 [61 P.2d 771]; *Gerson* v. *Kelsey,* 4 Cal.App.2d 158, 163 [40 P.2d 543, 43 P.2d 266]; *People* v. *Ottey,* 5 Cal.2d 714, 721 [56 P.2d 193].) For the same reason the trial judge is not to be unduly or unreasonably hampered in his control and conduct of the trial. (*Commercial U. A. Co.* v. *Pacific G. & E. Co.,* 220 Cal. 515, 525 [31 P.2d 793].)

Complaint is made of alleged errors in the admission and rejection of evidence. An examination of the record fails to support any of these specifications. As to certain of the witnesses who were beneficiaries under the proffered will testimony of prior inconsistent statements was admitted by way of impeachment. It is claimed that this violated the rule which excludes evidence of admissions of one beneficiary. (10 Cal.Jur. 1070.) The court showed a clear comprehension of this rule and consistently followed it. The evidence complained of was admitted for impeachment only, not as proof of any facts stated but for the limited purpose of their effect on the credibility of the witnesses making them. (27 Cal.Jur. 169.) In this there was clearly no error. The other specifications are either without support in the record or too trivial to require comment.

The judgment appealed from is affirmed.

Nourse, P. J., and Spence, J., concurred.

A petition for a rehearing was denied September 24, 1943, and a petition by appellants Hovander for a hearing by the Supreme Court was denied October 21, 1943.