[Civ. No. 14694. First Dist., Div. Two. Aug. 27, 1951.]

ROBERT H. MILLER, JR., Respondent; WARREN BOGGESS, Plaintiff and Appellant, v. THE COUNTY OF CONTRA COSTA, Defendant and Appellant.

Granville T. Burke for Plaintiff and Appellant.

Tinning & DeLap and J. Vance Porlier for Defendant and Appellant.

Carlson, Collins, Gordon & Bold, Robert V. Collins and Steven H. Welch, Jr., for Respondent.

GOODELL, J.—On Sunday, September 26, 1948, respondent Miller while flying an airplane onto Buchanan Field, near Concord, crashed and was injured about the face and head.

He sued the county as owner and operator of the airport, for his injuries. Appellant Boggess owned the plane, which was demolished, and sued in the same action for its value. Miller had judgment for $1,093.80, while Boggess was denied a recovery. Both the county and Boggess appeal on the same record.

Miller is a licensed pilot who had been flying from that field since June, 1947, and had more than 100 flying hours experience. He had taken up aviation "in lieu of a hobby, and partly to conduct business." He and others had made a group flight and were returning to the airport shortly after noon. The plane was a single-engine "Aeronca Chief" which had been rented by Miller from Boggess on that Sunday as on other occasions.

The area designated for landing was runway 32, which was about 4,600 feet long. Its "improved" strip was 150 feet wide and had a hard, paved surface. Adjoining and paralleling it on each side had been a shoulder of oiled dirt 75 feet wide, but these 75-foot shoulders had just been widened by the county to 105 feet.

In grading the additional 30-foot strips the machines had left a mound of dirt running along the outer edges thereof for their entire length. These mounds were of uneven height, varying from 6 to 18 inches. Boggess testified that "The dirt was left where it fell off the blade of the grader along the edge of the shoulder." It had solidified and was completely concealed by weeds about 2½ feet high. Miller testified that he had received no warning of this condition orally, by bulletin, red flag, or otherwise.

As he flew in, Miller set his plane down on runway 32 and after taxiing in the usual way down the center thereof for about 100 feet the plane suddenly veered to the left and went into a ground-loop, out of directional control. He was being followed onto the runway by other planes which created a hazard to all concerned, and instead of letting his plane "ride out" the ground-loop and risk collision with those following, he gave it "full throttle" in an attempt to regain the air and make a new landing. This application of full power caused the plane to taxi, at an angle of approximately 80 degrees left of the runway's center line, across the runway, the 75-foot shoulder, and its new 30-foot addition. Just before reaching the mound of dirt at the outermost edge the plane became air-borne, but, although a few inches off the ground it still had not enough altitude to clear the mound

of dirt. Its undercarriage struck the mound, which caused the plane to stall and crash.

### The County's Appeal.

The county denied any negligence and pleaded Miller's contributory negligence. It contends that he lost control "through his own negligence" and used "erroneous recovery tactics."

The case of *Parker* v. *James Granger, Inc.*, 4 Cal.2d 668, 677 [52 P.2d 226] (followed by *Pignet* v. *City of Santa Monica*, 29 Cal.App.2d 286, 287 [84 P.2d 166]) holds that in the absence of legislation the standard of care in airport cases such as this is to be judged by the general laws and rules of negligence.

First, with respect to the county's negligence:

The county concedes that Miller was its invitee but attempts to limit that status to certain parts only of the 530-acre field.

The court found that the plane "ran into and collided with a mound of dirt which paralleled said runway . . . ; that said mound of dirt was negligently and carelessly maintained by said defendant, and plaintiff . . . had no notice or knowledge of its existence; that the airplane . . . was caused to strike said mound of dirt as a proximate result of the carelessness of said defendant."

The grading of the widened shoulders started on September 15th. Two days later, on the 17th, a girl student-flyer "veered off the shoulder just slightly, and started out toward the weeds, and hit the mound of dirt on that north-south runway, and peeled the landing gear off." (This was not runway 32, but both runways were being widened.) Boggess, who owned her plane, vehemently complained to the airport manager. Notice of the dangerous condition, then, had been brought home to the county nine days before Miller's crash.

The airport manager admitted that the mound of dirt was a hazard, but qualified his answer by saying "but it was completely off the runway." After admitting that he knew student-pilots were using the runways and "frequently went into ground-loops" he was asked "And you felt that that mound of dirt then was a definite hazard, did you not, and it should be properly flagged?" and answered "Yes, sir, that is why we notified all fixed base operators of that fact." He then testified that ". . . the job was not completed at the time of the second accident [Miller's]. . . . We were working continuously there, trying to get the scrapings to feather out,

but because of the straw and weeds, and everything like that, we were having trouble in getting them to feather out into the field.''

The county admits that it was its duty ''to warn respondent of known dangers and to exercise ordinary care in keeping the land in a reasonably safe condition,'' but it contends that such duty ''applies only to that portion thereof where the invitee would, under the circumstances and conditions of his invitation, *naturally* be likely to go.''

However, Boggess testified that ''The ground rules at Buchanan Field specify the landing area to include the shoulders . . . the hard surface and shoulders'' and this was not contradicted. He testified also that the widening of the 75-foot shoulders had been completed and ''there was no differentiating there between the old and new shoulders, when you are talking about landing areas.'' He was asked ''And in the area that is plowed, are planes able to taxi over the area?'' and answered ''It is not the normal thing. However, in a recovery from a situation like this, that area could be utilized for recovery under normal conditions'' which testimony was not contradicted.

All this testimony was clearly sufficient to support an implied finding of fact that, as was said in *Gastine* v. *Ewing*, 65 Cal.App.2d 131, 140-1 [150 P.2d 266], ''the invitation, express or implied, included that part of the premises where the injury occurred.'' After all, it occurred on the very borderline of the over-all landing area (according to the ''ground rules'') and not within the plowed area, which, in any case, was also available under the ''Any port in a storm'' theory testified to by Boggess.

With respect to proximate cause:

In electing to try to regain the air, Miller, according to all the witnesses, did it the hard way, as the saying goes, but the fact remains that he almost succeeded. After the crash the airport manager retraced the plane's path and found that it had become air-borne about 10 feet before it reached the mound of dirt. Since the mound of dirt intercepted the plane's undercarriage, it is fair to say that had it not been there, Miller would have safely completed his difficult, emergency ''take-off.'' The finding that the mound of dirt was a proximate cause of the crash is thus amply supported by the evidence.

With respect to Miller's contributory negligence:

The court found that at the time of the collision plaintiff

"was exercising ordinary care for his own safety, and no negligence on the part of plaintiff . . . proximately, or in any manner, contributed to the happening of said accident."

 It is self-evident that plaintiff was confronted with a sudden emergency when his plane veered and went into the ground-loop. He was being followed into the airport by several other planes and he had their safety and his own to consider. Nobody could tell where the ground-loop, willy-nilly, would take him. The record shows that he then had two alternatives—either to "ride out" the ground-loop, or to attempt to regain the air, and it is undisputed that the latter was the more difficult of the two. Under the imminent peril rule it was a question for the trier of fact to determine whether the alternative which he chose would have been the choice of a reasonable man in his predicament (*Kirk* v. *Los Angeles Ry. Corp.*, 26 Cal.2d 833, 841 [161 P.2d 673, 164 A.L.R. 1] ; 19 Cal.Jur. 598, 599-600). Boggess testified "if there were a mound of dirt there, I certainly would probably do what he did." This testimony, given by an experienced flyer (who conducted a flying school at this field), was sufficient to support the implied finding that Miller's choice was that of a reasonable man under the circumstances.

 The finding that Miller was not negligent also settles the county's contention that Miller was negligent in relaxing the back pressure on the controls while on the runway and that this might have thrown him into the ground-loop in the first place. Plaintiff attributed his loss of directional control to "the quartering gust of wind." Various theories are advanced as to what caused the ground-loop, but it seems to be one of those things which cannot be determined with any degree of certainty in the absence of a mechanical failure, of which, it is conceded, there was none. Boggess, when questioned about a ground-loop testified that "you get it in any airport" which, we take it, is a flyer's way of saying that it is a mishap which might befall the best of pilots and planes from some cause or other, difficult to pin down or analyze. From plaintiff's testimony the court could have found that the plane was sent into the loop by "the quartering gust of wind," which would be neither "pilot error" nor negligence. On appeal, it goes without saying, the facts must be viewed in the light most favorable to the respondent. Plaintiff's testimony supports the findings in this respect, with only speculations opposed to it.

Following the rule of *Parker* v. *James Granger, Inc., supra,* and applying the standard rules of negligence, it must be concluded that the findings are fully supported by the evidence.

### The Boggess Appeal.

There was no plea of contributory negligence on this branch of the case. Nevertheless the court found that Boggess, with knowledge of the mound of dirt, was negligent in failing to warn Miller of it, and that "such negligence . . . proximately contributed to the happening of said accident. . . ."

The principal basis for this finding was the testimony of appellant himself, elicited by questions asked by the judge while Boggess was under direct examination by Miller's counsel as a witness for *both plaintiffs.* The questions and their answers were:

"The Court: Q. You knew . . . that dirt was there?

"A. Yes. I found it out the hard way 2 weeks before."

"The Court. Q. You didn't tell Mr. Miller about the dirt, did you?

"A. I don't recall whether I did or not." . . .

"The Court: Q. And you didn't say anything to Miller about this pile of dirt being there?

"A. Sir, I wouldn't say yes or no to that" . . .

"The Court. Q. Were you there when he came there to get the plane that morning?

"A. Yes, sir."

Appellant contends that as contributory negligence was not pleaded, it was not in issue, hence the court erred in asking these questions.

There was no error or impropriety in the questions (*McClure* v. *Donovan,* 33 Cal.2d 717, 736 [205 P.2d 17]; *Estate of Dupont,* 60 Cal.App.2d 276, 290 [140 P.2d 866], and cases cited; 27 Cal.Jur. § 49, pp. 65-66). Moreover, there was no objection and "it is too late to urge it as error for the first time on the appeal." (*People* v. *Ottey,* 5 Cal.2d 714, 721 [56 P.2d 193], and cases cited.) All four questions were relevant to the inquiry whether Miller (whose case was being tried with that of Boggess) had knowledge or notice of the hazard, and their answers tended to corroborate Miller's testimony that he had no knowledge or notice. The plaintiffs elected to combine their cases in one action and Boggess was testifying for *both plaintiffs.* Had the two cases been tried separately the present problem might never have arisen, or if it had, it would have been more sharply defined than it is

now. The answers, while relevant to Miller's case, tended at the same time to establish Boggess' negligence in not warning Miller.

■ We are satisfied that the evidence was sufficient to support the finding of negligence against Boggess, but we are not satisfied that it was sufficient to support the finding that his negligence "proximately contribtued to the . . . accident. . . ."

We have already discussed Miller's peril and the two alternatives he had. Under cross-examination Miller was asked: ". . . As a matter of fact, in the position that you were attempting to take off there, it was a completely improper position for that runway, was it not?" and answered "not in the condition that was existing." Further: "Well, you don't take off at the side of the runway?" and answered "Well, if it is a matter of your life or death, you take off in any direction you can, sir. If it is your neck, you are going to do the thing you think best to do." He then spoke of the peril which was present because of the planes following him onto the field, describing what might have happened had he ridden out the ground-loop and concluded with the remark "I didn't like it," which is readily understandable.

The inquiry whether Boggess' failure to warn Miller was a proximate cause of the crash naturally raises the question whether *with* warning Miller would have acted any differently. There is no evidence to indicate that he would have, and in its absence the question remains within the realm of speculation and conjecture. If Boggess had warned Miller or if a line of red flags had told him of the hazard, he might still have weighed one danger against the other, and done exactly the same thing.

Appellant Boggess was cross-examined as follows:

"Q. And his recovery from the ground loop is contrary to what you would instruct a student to do? A. Contrary to what I teach—not contrary to what some instructors teach. As I say. it is an elective thing.

"The Court: It is a matter of opinion? A. Yes.

"Mr. Porlier: Q. It is contrary to what you teach, however? A. Yes, it is.

"Mr. Porlier: Q. It is your opinion that the better thing to do in that instance is to let it roll itself out of the loop? A. Is to ride it through, yes."

On redirect the examination was as follows:

"Q. Having in mind the mound of dirt there, and you

were veering off toward that mound of dirt, would you give any—having in mind the condition of the field, would you give different instructions? A. Well, if there were a mound of dirt there, I certainly would probably do what he did."

For whatever it was worth, there was thus before the court without objection the testimony of an expert flier that even with full knowledge of the mound of dirt there he "certainly would probably do what he did."

That part of the judgment which awards respondent Miller $1,093.80 and costs is affirmed.

That part of the judgment which denies appellant Boggess a recovery is reversed, with the direction to the trial court to make a finding that Boggess' negligence was not a proximate cause of the accident, and to enter judgment in his favor against the county.

Both plaintiffs to have their costs on appeal.

Nourse, P. J., concurred.